## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | |
| PEREGRINE FINANCIAL GROUP, INC. , | ) | |
| | ) | Case No.  12 B 27488 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | Judge Carol A. Doyle |
| SECURE LEVERAGE GROUP, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Adversary No. 12 A 01572 |
| | ) | |
| IRA BODENSTEIN, not individually but | ) | |
| solely as the duly appointed Ch. 7 trustee of | ) | |
| the Estate of Peregrine Financial Group, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

The plaintiffs in this adversary proceeding were customers of Peregrine Financial Group, Inc. who traded in foreign currencies and over-the-counter metals through accounts with Peregrine.  They allege four counts in their complaint, each seeking return of money they deposited with Peregrine under a different legal theory.   In Count IV, plaintiffs seek a declaration that their transactions in foreign currency and metals are "commodity contracts" under § 761(4) of the Bankruptcy Code.   The funds they deposited with Peregrine would then be treated as "customer property," which is given high priority for distribution under the commodity broker liquidation provisions of the Bankruptcy Code.

The trustee has moved for summary judgment on Count IV, arguing that the plaintiffs' foreign exchange and metals trading does not fall within the definition of a "commodity contract."   He therefore contends that the funds they deposited with Peregrine are not "customer

property" entitled to high priority under the Bankruptcy Code.  The plaintiffs respond that their

transactions fall within the definition of "commodity contract," which specifically describes a

number of types of transactions and also includes transactions that are "similar to" those

specified types of transactions.  11 U.S.C. § 761(4).  The plaintiffs argue that their transactions

are "similar to" those specifically described in the definition.   The court disagrees and concludes

that the plaintiffs' foreign exchange and metals transactions do not fit within any of the

specifically described transactions in the definition and are not "similar to" any of those

transactions for purposes of § 761(4)(F)(i).   The funds they deposited with Peregrine, therefore,

are not "customer property," and the trustee is entitled to judgment as a matter of law on

Count IV.


I.      **Background**

        This adversary proceeding arises from the chapter 7 liquidation of Peregrine, a registered

"Futures Commission Merchant" ("FCM") and a registered "Forex Dealer Member" of the

National Futures Association ("NFA").  Before Peregrine filed for bankruptcy, the plaintiffs

opened accounts with it for the purpose of trading in retail foreign currency  ("retail forex") and

over-the-counter spot metals ("OTC metals").

        Each plaintiff executed a standard customer agreement ("Agreement") with Peregrine.

The Agreement covered all types of potential trading through Peregrine, not just retail forex and

OTC metals, including cash commodities, security futures products, commodities futures

contracts, commodity swaps, currency swap transactions, and various options and derivatives.

Some types of trading covered by the Agreement took place on regulated exchanges while some

2

types, including retail forex and OTC metals, did not.  Peregrine maintained an online trading

system that allowed customers to place trade orders electronically, which Peregrine would then

execute for them.  The plaintiffs allege that they deposited funds into specific accounts

designated by Peregrine for retail forex and OTC metals trading.

Peregrine filed for bankruptcy in July 2012, after theft of customer funds was disclosed.

In September 2012, the trustee filed a motion seeking authority to make interim distributions of

"customer property" under § 766(h) of the Bankruptcy Code, 11 U.S.C. § 766(h), to Peregrine's

customers who traded "commodity contracts," as defined in § 761(4) of the Bankruptcy Code.

The trustee excluded Peregrine's retail forex and OTC metals customers, including the plaintiffs,

from the partial distribution.  The plaintiffs objected to the trustee's motion, arguing that they too

traded commodities contracts and should be included in the interim distribution.  The court

overruled their objections and granted the trustee's motion.  The plaintiffs then filed a motion

seeking the same treatment as the customers who received interim distributions, but they

withdrew that motion and filed this adversary proceeding against the trustee seeking the same

relief.  The Commodities Futures Trading Commission ("CFTC") moved to intervene, and is

now a party.

Count IV alleges that the trustee's determination that the plaintiffs are not entitled to the

interim distributions because retail forex and metals transactions are not "commodity contracts"

was erroneous.  It states that these transactions fall within the "similar to" clause in §

761(4)(F)(i) in the definition of "commodity contract," which includes transactions that are

"similar to" the types of transactions specifically identified in the definition.  11 U.S.C. §

761(4)(F)(i).   They seek a declaration to that effect, and that the money in their accounts with

Peregrine must therefore be treated as "customer property" and distributed to them with the same priority given to customers to whom the trustee has already made interim distributions.

The trustee has moved for summary judgment on Count IV.  He argues that there are no genuine issues of material fact and that the court can decide as a matter of law that the plaintiffs' retail forex and OTC metals trading does not fall within the definition of "commodity contract" in § 761(4).   The CFTC filed briefs in support of the trustee's motion.

## II.    Standard for Summary Judgment

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see* Fed. R. Bankr. P. 7056 (applying Rule 56 of the Federal Rules of Civil Procedure to adversary proceedings); *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491 (7th Cir. 2000).   A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    Commodity Contracts

The bankruptcy and liquidation of a commodity broker is governed by subchapter IV of chapter 7 of the Bankruptcy Code, 11 U.S.C. § 761-784, and the CFTC's Part 190 regulations, 17 C.F.R. § 190.  Under the Bankruptcy Code and the Part 190 regulations, "customer property" is afforded high priority for distributions from the bankruptcy estate of an FCM.  "Customer property" is defined as "property received, acquired or held to margin, guarantee, secure,

purchase, or sell a commodity contract." 11 U.S.C. § 761(10)(A)(i); 17 C.F.R. § 190.08(a)(i)(A).  "Commodity contract" is defined in 11 U.S.C. § 761(4), which lists various specific types of contracts or transactions, and any contract or transaction that is "similar to" the listed contracts and transactions.  The plaintiffs seek a determination that their retail forex and OTC metals transactions fall within the definition of a "commodity contract" so that they can share in the distributions of "customer property" that the trustee has made in this case.  Thus, the definition of "commodity contract" in § 761(4) is at the center of this dispute.

Section 761(4) contains nine subparagraphs describing specific types of contracts and transactions that are "commodity contracts."   Subparagraph (F) also includes "any other contract, option, agreement, or transaction that is similar to a contract, option, agreement or transaction referred to in this paragraph." 11 U.S.C. § 761(4)(F)(i).  Count IV of the complaint alleges that the plaintiffs' retail forex and OTC metals transactions are "similar to" those described in § 761(4)(A)-(E).[1]  Subparagraphs (A) through (E) describe the following transactions:

(A)    with respect to an FCM, futures traded on a contract market or board of trade (domestic futures);

(B)    with respect to a foreign futures commission merchant, foreign futures (traded on a foreign contract market or board of trade);

(C)    with respect to a leverage transaction merchant, leverage transactions (long term contracts for the purchase or sale of certain precious metal bullion or coins);

---

[1]No party argues that the transactions described in subparagraphs (G) through (J) of § 761(4) are potentially similar to retail forex or OTC metals so the court will not address them.

(D)      with respect to a clearing organization, cleared futures and options;

(E)      with respect to a commodity options dealer, commodity options.


### A.      Futures

The parties' arguments focus primarily on the first category of commodity contracts listed in § 761(4) -  futures  The trustee contends that *In re Zelener*, 373 F.3d 861 (7th Cir. 2004), is controlling and compels the conclusion that plaintiff's retail forex and OTC metals transactions are not "similar to" futures contracts.  In *Zelener*, the court held that retail forex transactions are not futures.  In their response, the plaintiffs argue that *Zelener* is no longer good law and that, in any event, the retail forex transactions in this case should be considered futures under *Zelener*, or at least "similar to" the categories listed in § 761(A)-(E), which includes futures.[2]  *Zelener* is thus central to the analysis in this case.

#### 1.      *Zelener*

In *Zelener*, the Seventh Circuit considered whether "speculative transactions in foreign currency are 'contracts of sale of a commodity for future delivery' regulated by the Commodity Futures Trading Commission. . . ."  *Id.* at 862.  The issue arose in the context of determining whether contracts for sale of foreign currency were within the CFTC's regulatory authority in 2004.  The court was interpreting § 2(a)(1)(A) of the CEA, 7 U.S.C. § 2(a)(1)(A),  which describes the CFTC's jurisdiction as including "contracts of sale of a commodity for future

---

[2]As an FCM, only subparagraph (A) could apply to transactions conducted through Peregrine.  Subparagraphs (B) - (E) could not apply directly in this case because they are limited to transactions with respect to the other types of entities noted above: foreign futures commission merchant (B); leverage transaction merchant (C); clearing organization (D); and commodity options dealer (E).  Plaintiffs allege only that Peregrine was an FCM.

delivery," the same language used in the definition of a "commodity contract" in 11 U.S.C.

§ 761(4)(A).  The court explained that "future delivery" must have a technical meaning or else it

would encompass all executory contracts, leading to an absurd result.  That technical meaning

reflects the important distinctions between a futures contract and a forward or spot contract.[3]  As

the Seventh Circuit explained:

> In organized futures markets, people buy and sell contracts, not commodities.
> Terms are standardized, and each party's obligation runs to an intermediary, the
> clearing corporation. Clearing houses eliminate counterparty credit risk. Standard
> terms and an absence of counterparty-specific risk make the contracts fungible,
> which in turn makes it possible to close a position by buying an offsetting
> contract.  All contracts that expire in a given month are identical; each calls for
> delivery of the same commodity in the same place at the same time.  Forward and
> spot contracts, by contrast, call for sale of the commodity; no one deals "in the
> contract"; it is not possible to close a position by buying a traded offset, because
> promises are not fungible; delivery is idiosyncratic rather than centralized.

*Id*. at 865-866.

Other circuits have adopted a similar standard for distinguishing between a spot or

forward sale of a commodity and a futures transaction "in the contract" involving fungible

contracts with standardized terms that are traded on an exchange that bears the risk of a counter-

party not performing.  *See e.g., CFTC v. Erskine*, 512 F.3d 309 (6th Cir. 2008) (adopted *Zelener*

test in concluding that forex trading is not futures and rejecting an approach focusing on intent to

make actual delivery); *In re Olympic Natural Gas Co.*, 294 F.3d 737 (5th Cir. 2002);  *CFTC v.*

*Co Petro Marketing Group, Inc.*, 680 F.2d 573 (9th Cir. 1982).

---

[3]A futures contract is an agreement to purchase or sell a particular commodity at a fixed
date in the future.  *See CFTC v. Erskine*, 512 F.3d 309, 323 (6th Cir. 2008).  A spot contract is
one for the immediate sale and delivery of a commodity or for delivery within 48 hours.  *See
Lachmund v. ADM Inv. Servs., Inc.*, 191 F.3d 777, 786 (7th Cir. 1999).  A forward contract is for
the present purchase or sale of a commodity that provides for delivery at some future date, more
than 48 hours after the date the contract is entered.  *See* 11 U.S.C. § 101(25).

In *Zelener*, defendant AlaronFX dealt in retail foreign currency.  The customer agreement provided that AlaronFX was the counterparty to its customers.  A customer would place the order to buy or sell a particular currency in a quantity chosen by the customer.  The contract called for settlement within 48 hours.  The customers rarely made payment within that time and none took delivery of the currency.  AlaronFX could have reversed the transaction within the 48 hours and charged or credited the customer with any change in price over the course of those two days.   Instead, AlaronFX rolled them forward two days at a time. Successive rollovers meant that a customer could keep an open position in the currency.  If the currency appreciated during that time, the customer could close the position and reap the profit by taking delivery or selling an equal amount of currency back to AlaronFX.  If the currency fell, then the customer suffered a loss when the position was closed by selling currency back to AlaronFX.   The profit or loss was determined by the difference in the prices offered when the customer opened the position with the initial transaction and when it closed the position by entering into an opposing transaction.

The *Zelener* court distinguished these retail forex transactions from futures contracts because the "customer buys foreign currency immediately rather than as of a defined future date, and because the deals lack standard terms.  AlaronFX buys and sells as a principal; transactions differ in size, price, and settlement date. The contracts are not fungible and thus could not be traded on an exchange." *Zelener*, 373 F.3d at 864.  The court therefore concluded that the forex trades were spot sales for delivery within 48 hours.

The retail forex trading at Peregrine worked in essentially the same way as in *Zelener*. The plaintiffs do not dispute that the retail forex trades involved transactions in the currencies

8

themselves, there was no trading in "the contract," there were no standardized terms so the

contracts were not fungible, each transaction was unique in the amount of the currency and price,

delivery for each transaction was idiosyncratic rather than centralized, the transactions were not

made on an exchange, and there was no clearinghouse so no third party took on the risk of

nonperformance by a counterparty.

   The Agreement in this case is also remarkably similar to the customer agreement in

*Zelener*.   Section 7 of the Agreement contains most of the provisions governing forex trading.

This section begins by explaining that foreign currency transactions (referred to as "Currency

Forex") "are traded on the 'interbank' system, and not on regulated exchanges like commodities.

The interbank system consists of counterparties that exchange currency positions with each

other."  Peregrine Customer Account Agreement, para. 7 (Ex. B to Plaintiffs' Statement).  The

Agreement also provides that Peregrine "shall act as a principal and is the counter-party in each

Currency Forex contract or transaction with Customer."  Para. 7(a).  "Prices and valuations for

Currency Forex are set by [Peregrine] and may be different from prices reported elsewhere."

Para. 7(b).  The customer agreed "to instruct [Peregrine] as to the offset or rollover of a foreign

currency position."  Para. 7(c).   In the absence of timely instructions from the customer,

Peregrine "is authorized, at [Peregrine's] sole and absolute discretion, to deliver, roll over or

offset all or any portion of the Currency Forex positions in the Customer's Account and at

Customer's risk."  Para. 7(c).   The Agreement also specifies that each transaction is a separate

transaction but that Peregrine, in its discretion, could elect to treat two or more open, opposite

transactions as a single transaction and net the difference.  Para. 7(f) and (g).   Thus, the essential

and undisputed facts in this case are almost identical to those in *Zelener*.  As in *Zelener*, the

retail forex transactions in this case were spot transactions, not futures.[4]  Indeed, the plaintiffs

themselves admitted as much in depositions.  They testified that their forex transactions were

spot transactions at an "immediate" price, not a future price, that they were transactions in the

actual currency, not in a contract, and that the forex market was "the spot market, the cash

market."  Trustee Stmt. Par. 20.[5]

### 2.    Plaintiffs' Attempts to Avoid *Zelener*

Plaintiffs argue that *Zelener* is not controlling for several reason, including that it is no

longer good law and does not apply in any event.  These arguments are not persuasive.

First, plaintiffs argue that *Zelener* is no longer good law because it was "explicitly

overturned" by a statutory amendment to the CEA enacted in 2008.   This is not correct.

*Zelener* concluded that the CFTC did not have jurisdiction under the CEA to regulate retail forex

transactions because they were not futures.  Congress then chose to expand the anti-fraud

---

[4]The trustee contends the forex transactions in this case are spot contracts - for delivery
immediately or within 48 hours, not forward contracts for delivery more than 48 hours after they
are entered.  The plaintiffs never challenge this contention directly; they argue instead that
rollover provisions discussed below make this term irrelevant in practice.  In fact, plaintiffs
quote repeatedly from the trustee's motion to approve the interim distribution stating that forex
contracts had an initial expiration date two trade dates following the date on which the
transaction occurred.  Thus, the parties appear to agree that the retail forex contracts called for
settlement within 48 hours, thus falling into the definition of a spot contract, not a forward
contract.  Under *Zelener*, the result would be the same whether the forex transactions were spot
or forward contracts - in either case they would not be futures.

[5]Paragraph 20 of the trustee's statement of undisputed facts states that the plaintiffs' retail
forex transactions were spot transactions.  He supports this statement with various documents,
including the deposition testimony of four of the plaintiffs acknowledging that their retail forex
trades were spot transactions.   In their response to the trustee's statement of facts, the plaintiffs
say this statement is "controverted because the statement is conclusory and incomplete," but they
cite only a two-sentence quote from the trustee's motion for authority to make interim
distributions.   The quote does not in any way refute the evidence cited by the trustee so the
plaintiffs' attempted denial of the statement is ineffective.

jurisdiction of the CFTC in 2008, in what is sometimes referred to as "the *Zelener* fix," to give

the CFTC jurisdiction over retail forex.  7 U.S.C. § 2(c)(2)(C)(iv).  In doing so, Congress did not

reject the holding in *Zelener* that retail forex transactions are spot contracts, not futures

contracts.   Instead, as discussed more fully below, although Congress was specifically aware of

the *Zelener* and *Erskine* holdings, it chose not to include retail forex in the definition of

"commodity contract" when it amended the definition in 2005 and 2010, or when it amended the

CEA to include forex in the CFTC's anti-fraud jurisdiction in 2008.   So, rather than overturning

*Zelener*, Congress left intact the court's determination that retail forex transactions are spot

contracts, not futures.  *Zelener* is still controlling in this circuit regarding the distinction between

futures contracts and spot and forward contracts generally, and specifically that retail forex

transactions are not futures.[6]  *See  U.S. v. Walsh*, 723 F.3d 802, 811 (7th Cir. 2013) (noting the

continuing validity of *Zelener*,  stating that "*Zelener* held that rollovers of foreign currency sales

were not contracts of sale of a commodity for future delivery but were instead spot sales.").

    Plaintiffs next argue that *Zelener* does not apply because their retail forex transactions

fall within an exception discussed in *Zelener*.   The *Zelener* court noted that it had previously

recognized an exception to the general rule that off-exchange transactions in a commodity itself

may not be futures when "the seller of the contract promises to sell another contract against

which the buyer can offset the first contract ... That promise could create a futures contract."  *Id.*

at 868.  The court explained that a "promise to create offsets makes a given setup work *as if*

---

[6]Plaintiffs attempt to make much of the fact that the CFTC took the position in *Zelener*
and other cases that it had jurisdiction to regulate retail forex and that it is taking a contrary
position in this case.  Positions taken on these issues by the CFTC in previous cases have no
bearing on this case.  *Zelener* is the law in this circuit.

fungible: although the customer can't go into a market to buy an equal and opposite position, the dealer's promise to match the idiosyncratic terms in order to close the position without delivery means that the customer can disregard the absence of a formal exchange." *Id.* For this potential exception to apply, the dealer must have "promised to sell the offsetting position, and thus allow netting on demand." *Id.* The court found no such promise in the AlaronFX customer agreement. It contained a provision stating that, if the customer failed to give timely instructions for the disposition of a position, then AlaronFX was authorized, in its sole discretion, to deliver, roll over or offset all or any portion of the open position at the customer's risk. AlaronFX also agreed to attempt to execute, in its sole discretion, all orders from the customer in accordance with the customer's instructions. The court concluded that neither of these provisions was a promise to provide an offsetting trade so that the customer could net out its position upon demand.

The Agreement in this case contains two provisions that are very similar to those described in *Zelener* regarding rollover of contracts, which did not transform the forex transactions into futures. The plaintiffs nonetheless attempt to shoehorn this case into this exception recognized in *Zelener*. First, they argue that, unlike AlaronFX, Peregrine made the requisite unconditional promise to sell the customer an offsetting position to close out any open forex position. The only provision they cite, however, is Paragraph 7(b) of the Agreement. It provides:

> Prices and Valuations for Currency Forex. Prices and valuations for Currency Forex are set by PFGBEST [Peregrine] and may be different from prices reported elsewhere. PFGBEST *will provide prices* to be used in trading, valuations of Customer positions and determination of margin requirements. Although PFGBEST expects that these prices will be reasonably related to prices available in the interbank market, prices reported by

> PFGBEST may vary from prices available to banks and other counterparties in what is
> known at the interbank market.

Agreement, Para 7(b) (emphasis added).  Plaintiffs contend that the statement that "PFGBEST will provide prices to be used in trading" constitutes an unambiguous promise to provide an offsetting contract for any open forex position and permit netting upon demand by the customer. It requires no such thing.  Instead, it gives Peregrine alone the power to set all prices to be used in trading, in determining the value of a customer's positions, and in determining margin requirements, making it clear that prices available on the interbank system would not control for these purposes.   This provision does not create the unconditional right to buy an offsetting contract from or through Peregrine upon demand by the customer.

Second, Plaintiffs contend that, in any event, a NFA rule requires "the offset of *all* matching retail forex positions."  Plaintiff Brief at p. 13.   They argue that the NFA rule requires forex dealers to offer offsetting transactions upon demand of the customer.  The NFA Rule in question, however, does not require this.  Instead, it provides that forex dealers "may not carry offsetting positions in a customer account, but must offset them on a first-in, first-out basis." NFA Compliance Rule 2-43(b).  Thus, the rule requires that *if* there are two offsetting transactions in a customer's account, then the dealer must offset them on a first-in, first-out basis.  The rule does not impose the obligation to provide an offsetting transaction for every open retail forex position to allow netting upon demand by the customer.  This NFA Rule was quickly followed by a CFTC regulation issued in 2010, 17 C.F.R. § 1.46, which makes it clear that a setoff must occur only when an opposing transaction already exists in the customer's account.  *See IKON Global Markets, Inc. v. CFTC*, [2012 Transfer Binder] Comm. Fut. L. Rep.

13

(CCH) ¶ 32,208, n. 3 (D.D.C. May 15, 2012).  Neither the NFA rule nor the CFTC regulation

bring the Peregrine retail forex transactions within the exception recognized in *Zelener*.[7]

Finally, the plaintiffs argue that the court cannot determine the nature of the retail forex

transactions on summary judgment because there are issues of fact regarding the Agreement and

how the trading actually worked at Peregrine.  They contend that the court must admit parole

evidence, which requires a trial.   None of their arguments is persuasive.  First, the plaintiffs

argue that the contract is ambiguous and contradictory regarding the time for giving instructions

regarding settlement or rollover and the consequences of failure to give instructions.   Even if the

plaintiffs were correct, this potential issue has no impact on the analysis - the essential features

of the transactions discussed above are undisputed and dispositive.   Next, they argue that

settlement by delivery was never intended and could not occur because they never provided

foreign bank information for the delivery of foreign currencies.   This, too, makes no difference.

*Zelener* rejected the argument that intent to accept delivery matters in the analysis of whether a

transaction is a future, or a spot or forward.   The court noted that "[I]t is essential to know

beforehand whether a contract is a futures or a forward," and that "[n]othing is worse than an

---

[7] A CFTC regulation requires forex dealers to give each customer a Forex Risk
Disclosure.  It provides:

> Your ability to close your transactions or offset positions is limited to what your
> dealer will offer to you, as there is no other market for these transactions. . . .  The
> terms of your account agreement alone govern the obligations your dealer has to
> you to offer prices and offer offset or liquidating transactions in your account and
> make any payments to you.

15 C.F.R. § 5.5(b).  Thus, the CTFC does not view the NFA rule or its own regulation regarding
the offset of opposing currency transactions on a first-in first-out basis to require a dealer to offer
offsetting transactions.

14

approach that asks what the parties 'intended' or that scrutinizes the percentage of contracts that

lead to delivery *ex post*." 373 F.3d at 866.  Thus, the actual intention of the parties regarding

delivery does not matter.  Finally, the plaintiffs argue that, because the Agreement dealt with

many types of trading, there is a theoretical risk that a customer's funds could be "misclassified"

for purposes of § 761(4).   They do not allege that any misclassification has occurred or present

any evidence of a misclassification.

Thus, there are no genuine issues of fact that matter, and the court can determine as a

matter of law that the plaintiffs' retail forex trades were spot contracts, not futures, based on

*Zelener* and the undisputed facts.

### B.        Similarity Clause

Concluding that retail forex transactions conducted through Peregrine were not futures

does not, however, end the inquiry.   As noted above, a transaction can be  a "commodity

contract" if it fits within one of the types of transactions specifically described in § 761(4), or if

it is "similar to" one of those transactions for purposes of 761(4)(F)(i).

The trustee argues that *Zelener* is controlling on this issue - that retail forex transactions

are not "similar to" futures for the same reasons that they are not actually futures.   He also

contends that various amendments to the Bankruptcy Code and the CEA demonstrate that

Congress chose to exclude retail forex customers from the definition of commodity contract.

The court agrees on both points.

### 1.      *Zelener* **and the Similarity Clause**

Although *Zelener* interpreted the definition of a futures contract under the CEA and did

not address the similarity clause, its analysis is nonetheless directly relevant and compels the

conclusion that retail forex transactions are not "similar to" futures.   There are no written judicial

opinions construing the similarity clause, and the legislative history provides little guidance.

Merriam Webster defines "similar" as "alike in substance or essentials."   Webster's Third New

International Dictionary (2000).  Applying this ordinary meaning, under *Zelener,* these two types

of transactions are not alike in substance or essentials.  As discussed above, futures involves

trading "in the contract" with fungible contracts containing standardized terms traded on

regulated exchanges where a clearinghouse accepts the risk of counterparty default.  Futures

trading has been highly regulated for many decades.   Retail forex is at the opposite end of the

trading spectrum.  It involves private, off-exchange transactions, each of which is unique in

terms of currency pair, quantity, and settlement date.   No clearinghouse bears the risk of default

by a counterparty, and it was virtually unregulated until 2000.   The primary similarity between

retail forex and futures is that both are used for speculation by parties who have no intention of

actually taking delivery.   This similarity, as *Zelener* held, is not significant and does not

outweigh the many crucial differences between these two types of transactions.  *Zelener*, 373

F.3d at 865-66.  Thus, applying the ordinary meaning of "similar," retail forex is not "similar to"

futures.

### 2.      **History of Commodities Regulation**

This conclusion is supported by the history of commodities regulation and the

amendments to both the Bankruptcy Code and the CEA, which make it clear that Congress did

16

not intend to include spot retail forex (or OTC metals) in the definition of commodity contract.

When the CEA was enacted in 1936, it governed only futures transactions, not spot or forward

transactions.  As the Fourth Circuit explained:

> Because the [CEA] was aimed at manipulation and speculation, and other abuses
> that could arise from the trading in futures contacts and options, as distinguished
> from the commodity itself, Congress never purported to regulate "spot"
> transactions (transactions for the immediate sale and delivery of a commodity) or
> "cash forward" transactions (in which the commodity is presently sold but its
> delivery is, by agreement, delayed or deferred) . . . .   Transactions in the
> commodity itself which anticipate actual delivery did not present the same
> opportunities for speculation, manipulations, and outright wagering that trading in
> futures and options presented.   From the beginning, the CEA thus regulated
> transactions involving the purchase and sale of a commodity "for future delivery"
> but excluded transactions involving "any sale of any cash commodity for deferred
> shipment or delivery." 7 U.S.C. § 2.   The distinction, though semantically subtle,
> is what the trade refers to as the difference between "futures," which generally are
> regulated, and "cash forwards" or "forwards," which are not.

*Salomon Forex, Inc. v. Tauber*, 8 F.3d 966 (4th Cir. 1993), *cert. denied*, 511 U.S. 1031 (1994).

*See also Lachmund v. ADM Investor Services, Inc.*, 191 F.3d 777, 786 (7th Cir. 1999) (quoting

*Salomon*).  Since its enactment, the CEA required trading in futures to be conducted only on

regulated exchanges through FCMs.   FCMs were also required to hold all funds from futures

customers in segregated accounts and treat them as solely the property of the futures customer

pursuant to a statutory trust.  7 U.S.C. § § 6d(a)(2) and 6d(b).

Over time, as off-exchange markets emerged in which retail customers could engage in

purely speculative trading, Congress gradually expanded the reach of the CEA and the CFTC to

cover these markets.  Congress enacted the first law affecting retail forex in 2000, when it

adopted some limitations on the types of firms that could enter into forex transactions with retail

customers.  *See Erskine*, 512 F.3d at 313 and *CFTC v. Uforex Consulting, LLC*, 551 F. Supp. 2d

513, 532 (W.D. La. 2008).  In 2008, after *Zelener* and *Erskine*, Congress expanded the anti-fraud

jurisdiction of the CFTC to include retail forex, *see* 7 U.S.C. 2(c)(2)(C)(iv), and it authorized the

CFTC to establish standards for counterparties to retail forex transactions. *See* 7 U.S.C. §

2(c)(2)(B)(iv)(III); 2(c)(2)(B)(v); 2(c)(2)(C)(iii)(III). When Congress made those amendments,

it was specifically aware that *Zelener* and *Erskine* held that retail forex transactions were not

futures and therefore would not fall within the definition of 'commodity contract," yet it chose

not to add retail forex to the definition.

In 2010, Congress again expanded the CTFC's power, giving it specified authority over

off-exchange retail transactions in all commodities, even transactions construed as spot or

forward contracts. *See* 7 U.S.C. § 2(c)(2)(D)(iii). It also amended the definition of "commodity

contract" again, this time to add a broad array of cleared transactions. 11 U.S.C. § 761(4)(F)(ii)

(adding, with respect to an FCM or clearing organization, "any other contract, option, agreement

or transaction, in each case, that is cleared by a clearing organization.") Once again, though,

uncleared transactions like retail forex were not included in the definition of "commodity

contract." Under the age-old rule of statutory construction that *expressio unius est exclusio

alterius* (to express one thing implies the exclusion of the other), by choosing to include only

cleared transactions, Congress implicitly excluded all uncleared transactions not specifically

described in other subparagraphs of the definition. *See In re Globe Building Materials, Inc.*, 463

F.3d 631, 635 (7th Cir. 2006). These amendments thus reflect Congressional intent to exclude

retail forex from the definition of "commodity contract" and therefore from the protections

afforded to "customer property" under the Bankruptcy Code**.**

18

### 3.    CFTC Regulations

This conclusion is consistent with the CFTC's regulations and its interpretation of the CEA and the Part IV provisions of the Bankruptcy Code.  Congress created the CFTC in 1974 to regulate commodity futures in the U.S.  In 1978, Congress first enacted the Part IV provisions of chapter 7 governing the bankruptcy of a commodity broker in an effort to "maintain consistency with the Commodity Exchange Act."  *See* S. Rep. No. 95-989, at 7-8 & fn 1, 1978 U.S.C.C.A.N. 5787, 5793-94.  At the same time, Congress authorized the CFTC to promulgate rules or regulations dealing with various aspects of bankruptcies of commodity brokers.  7 U.S.C. § 2.  In 1983, the CFTC promulgated the Part 190 regulations governing commodity broker bankruptcies.  The Part IV provisions of the Bankruptcy Code, the CEA, and the Part 190 regulations operate together to govern bankruptcies of commodity brokers.

The Part 190 regulations generally attempt to align the definitions of "commodity contract" and "customer property" in the Bankruptcy Code with the segregation requirements of the CEA and CFTC regulations.   Segregation of customer funds is the highest level of customer protection provided under the CEA and CFTC regulations.   FCMs must treat customer funds as the property of the customer, not the FCM.  *See, e.g.,* 7 U.S.C. § 6d(a)(2), (b).  Section 766(h) of the Bankruptcy Code and the Part 190 regulations then give customer property the highest priority for distribution in bankruptcy, with the exception of certain administrative expenses, consistent with their treatment as property of the customer under the CEA and CFTC regulations.

When Congress enacted the Part IV provisions governing commodity broker bankruptcies in 1978, it also granted the CFTC the power, "notwithstanding Title 11" (the

Bankruptcy Code), to determine by rule or regulation that certain cash, securities, other property or commodity contracts are to be included or excluded from customer property." 7 U.S.C. § 24(a)(1). The CFTC and the trustee contend that this provision permits the CFTC, in effect, to alter the definitions of "customer property" and "commodity contract" in § 761 of the Bankruptcy Code. The plaintiffs dispute that the CFTC's authority is so broad, but whatever the full extent of authority granted to the CFTC, it has promulgated regulations defining classes of "customer property" that get priority in bankruptcy. These classes do not include retail forex or OTC metals because the CEA and CFTC regulations do not require segregation of customer funds for these types of trading.

Regulation 190.08 provides that "customer property" is to be ratably distributed to customers from the applicable pools of customer property in separate customer "account classes." 17 C.F.R. § 190.08. Part 190 identifies five such account classes: futures accounts, foreign futures accounts, leverage accounts, cleared swap accounts, and "delivery accounts." 17 C.F.R. § 190.01(a)(1). With the exception of delivery accounts, which deal with specifically identifiable property associated with delivery, these account classes correspond directly to the classes of transactions protected by segregation requirements. Segregation is required under the CEA and CFTC regulations for customers trading in domestic futures, foreign futures, leverage contracts, and cleared swaps.[8] All of these transactions are defined as commodity contracts in

---

[8]*See* 7 U.S.C. § 6d(a)(2) (segregation requirements for domestic futures); 17 C.F.R. § 30.7(b), (e)(2) (foreign futures); 17 C.F.R. § 31.12(a) (leverage transactions); 7 U.S.C. § 6d(f) (cleared swaps).

§ 761(4).  11 U.S.C. § 761(4)(A), (B), (C), and (F)(ii).[9] As plaintiffs concede, nothing in the

CEA or CFTC regulations requires segregation of funds from customers trading in retail forex or

OTC metals.  Thus, by design, the CFTC did not include classes for retail forex or OTC metals

because FCMs are not required to segregate the funds of these customers.

In fact, instead of including retail forex in the classes of  "customer property," the CFTC

issued a regulation requiring forex dealers to provide a notice to all retail forex customers

specifically informing them that any money they deposit with their dealer has "no regulatory

protections."  It warns customers that:

> Funds deposited by you with a futures commission merchant or retail foreign exchange
> dealer for trading off-exchange foreign currency transactions *are not subject to the
> customer funds protections* provided to customers trading on a contract market that is
> designated by the Commodity Futures Trading Commission.    *Your dealer may
> commingle your funds with its own operating funds or use them for other purposes*.  In
> the event your dealer becomes bankrupt, any funds the dealer is holding for you in
> addition to any amounts owed to you resulting from trading, whether or not any assets are
> maintained in separate deposit accounts by the dealer, *may be treated as an unsecured
> creditor's claim*.

Forex Risk Disclosure Statement, 17 C.F.R. § 5.5(b) (emphasis added).  Thus, under the CFTC's

regulations and its interpretation of the Part IV provisions of the Bankruptcy Code,  funds of

customers trading retail forex are not "customer property" and do not get any special priority in

bankruptcy.

While the CFTC's views are not controlling regarding the interpretation of the definition

of  "commodity contract" in § 761(4), *see Zelener*, 373 F.3d at 867, it presents a compelling

---

[9]Section 761(4)(F)(ii) appears to describe the functional equivalent of cleared swaps.
"Swap agreement" is expansively defined in 11 U.S.C. § 101(53B).

explanation of the overall statutory and regulatory scheme that supports the conclusion that

retail forex does not fall within the definition of "commodity contract."

### 4. Plaintiffs' Arguments

Plaintiffs argue that retail forex fits within the similarity clause for a number of reasons,

none of which has merit.

### a. Common Denominator Approach

First, instead of trying to demonstrate that retail forex has the same essential features as

any of the transactions specifically listed  in § 761(4)(A) - (E), plaintiffs argue that the court

should determine what each of the specific categories listed in § 761(4) have in common and

then conclude that all transactions with those common characteristics fall within the similarity

clause.  Under the plaintiffs' theory, the only factor common to all the transactions specifically

listed in § 761(4) is that they are regulated in some way by the CFTC.[10]  Since retail forex is now

regulated by the CFTC, they contend that it falls within the similarity clause. Plaintiffs point to

no statutory language, legislative history, or other support for this "common denominator"

approach, which would sweep into the definition of "commodity contract" every type of

transaction within the current regulatory authority of the CFTC.   If Congress intended the

definition of "commodity contract" to be so broad,  it would have defined it simply as all

transactions regulated by the CFTC.   Instead, Congress crafted the more complex and limited

_____

[10]Plaintiffs submitted the affidavit of an attorney they propose as an expert who offers
legal opinions on various topics, including on this issue regarding similarity.  The plaintiffs do
not discuss any specific testimony he would give in their response brief, but his testimony is
inadmissible in any event because it consists of legal opinions.  *See United States v. Sinclair*, 74
F.3d 753, 757 n. 1 (7th Cir. 1996); *see also Sunstar, Inc. v. Alberto-Culver Co.*, 586 F.3d 487,
496 (7th Cir. 2009).  His affidavit, therefore, cannot be considered on summary judgment and
does not create a genuine issue of material fact.

definition in § 761(4) that specifically includes certain transactions and by implication excludes others.

### b.     Legislative History

The plaintiffs also argue that the legislative history of § 761(4) supports their broad interpretation of the similarity clause.  The similarity clause was added through the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").   Plaintiffs cite a report of the House Judiciary Committee on BAPCPA that discussed changes made in BAPCPA to the definitions in the Federal Deposit Insurance Act (FDIA) and Federal Credit Union Act (FCUA) to make them consistent with the definitions of the Bankruptcy Code and to reflect the enactment of the Commodity Futures Modernization Act of 2000.   In discussing the definition of "swap agreement" in the FDIA, the House report states:

> [T]the definition of a swap agreement was originally intended to provide sufficient flexibility to avoid the need to amend the definition as the nature and uses of swap transactions matured. To that end, the phrase for any other similar agreement was included in the definition. (The phrase for any similar agreement has been added to the definition of forward contract, commodity contract, repurchase agreement and securities contract for the same reason.)

H.R. REP. NO. 109-31 at 121 (2005).

Plaintiffs assert that the statement about flexibility applies to the similarity clause in § 761, and that retail forex should somehow fall into this "flexible" definition of "commodity contract." To the extent the sentence in parentheses was intended  to explain the addition of the similarity clause to the definition of "commodity contract" in the Bankruptcy Code, it does not assist the plaintiffs.

First, the discussion in the House report had nothing to do with whether retail forex should be included in the definition of "commodity contract."  Instead, the BAPCPA

23

amendments regarding commodities trading were designed to expand the "safe harbor" for

financial contracts -  insulation from the automatic stay and limitations on preferential and

fraudulent transfer proceedings to protect the financial markets on which derivatives are traded.

*See* Edward R. Morrison and Joerg Riegel, *Financial Contracts and the New Bankruptcy Code:*

*Insulating Markets from Bankrupt Debtors and Bankruptcy Judges*, 13 Am. Bankr. Inst. L. Rev.

641 (2005).   Second, the language quoted by plaintiffs suggests that Congress wanted to include

transactions similar to those specifically identified in § 761(4) as they evolved in the marketplace

in the future, not to include categorically different types of transactions that were occurring at

the time of the amendment of which Congress was fully aware, like retail forex.  The legislative

history cited by the plaintiff thus supports the court's conclusion that Congress did not intend to

bring transactions like retail forex into the definition of commodity contract through the

similarity clause, not the plaintiffs' contentions.

### c.  Segregation Requirements

Plaintiffs also challenge the CFTC's contention that the "customer property" protections

under the Bankruptcy Code are intended to be consistent with the segregation requirements

under the CEA and CFTC regulations.   First, they argue that "trade options" are not subject to

segregation requirements but fall within subparagraph (E) of definition of  "commodity

contract."   Plaintiffs neither define "trade options" nor explain how they are similar to or

different from the options covered by § 761(4)(E).  The CFTC responds that "trade options" are

not synonymous with the commodity options included in § 761(4)(E), and do not necessarily fall

within subparagraph (E).  The court need not resolve this issue to conclude that the CFTC has

promulgated regulations to create consistency between the segregation requirements and the

treatment of "customer property" under the Bankruptcy Code.    Even if the plaintiffs' position

was correct, a lack of perfect correlation between the segregation requirements and the

specifically listed transactions in § 761(4) would not undermine the CFTC's central position,

and would have no impact on the court's analysis based on *Zelener* and the history of the

Congressional regulation of commodities trading.

Second, plaintiffs argue that, even though segregation of retail forex customer funds is

not required by the CEA or CFTC regulations, the requirements imposed on forex dealers are

"not substantially different in structure and effect" from the segregation requirements.  Plaintiffs'

Response at p. 19.  This is not correct.  The regulations on which plaintiffs rely require forex

dealers to maintain assets equal to their total aggregate forex obligations.  17 C.F.R. § 5.8.  They

do not require the require forex dealers to hold the funds in trust for the customer or prohibit the

commingling of customer funds with the dealer's own assets.    They are not the functional

equivalent of the segregation requirements.


**C.    OTC Metals**

Most of the plaintiffs' arguments focused on retail forex, not OTC metals, for good

reason.  The plaintiffs admit that their OTC metals transactions are spot contracts, not futures.

These transactions are not "retail" trades but instead can be conducted only by Eligible Contract

Participants ("ECP"), who are sophisticated investors with a high net worth.  Only one of the

plaintiffs, Treasure Island Coins ("TIC"), traded in OTC metals.   It is an ECP.   The transactions

are principal-to-principal, do not occur on an exchange, and are not cleared.  In fact, OTC metals

transactions conducted through Peregrine were not regulated at all under the CEA because of a

statutory exemption that was in effect until after the petition date.  7 U.S.C. § 2(g); 77 Fed. Reg.

41260 (July 13, 2012).   Plaintiffs present no basis for concluding that TIC's OTC metals trading

is similar to any of the categories of commodity contracts specified in § 761(4).   Even their

general argument that the similarity clause should bring within the definition of "commodity

contract" all types of transactions regulated by the CFTC would not sweep in OTC metals

transactions, because they were not regulated by the CFTC until after Peregrine filed for

bankruptcy.   TIC's OTC metals trades were unregulated and uncleared spot transactions that are

not "similar to" any type of transaction listed in § 761(4).


IV.     CONCLUSION

     For all of these reasons, there is no genuine issue of material fact and the trustee is

entitled to judgment as a matter of law on Count IV of the complaint.  The plaintiffs' retail forex

and OTC metals transactions are not commodity contracts for purposes of § 761(4) of the

Bankruptcy Code.

Dated:   May 7, 2014                         ENTERED:

                                             Carol A. Doyle
                                             United States Bankruptcy Judge

26