## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | |
| PEREGRINE FINANCIAL GROUP, INC. , | ) | |
| | ) | Case No.  12 B 27488 |
| Debtor. | ) | |
| ————————————————————— | ) | |
| | ) | Judge Carol A. Doyle |
| SECURE LEVERAGE GROUP, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Adversary No. 12 A 01572 |
| | ) | |
| IRA BODENSTEIN, not individually but | ) | |
| solely as the duly appointed Ch. 7 trustee of | ) | |
| the Estate of Peregrine Financial Group, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

The plaintiffs in this adversary proceeding are former customers of Peregrine Financial

Group, Inc. who traded in foreign currencies and over-the-counter metals.  The Bankruptcy Code

gives high priority to certain types of customers in the bankruptcy of a commodities broker like

Peregrine.   The trustee of Peregrine determined that the plaintiffs did not fall within this group

of customers, so he did not include them in interim distributions made thus far in the bankruptcy

case.  The plaintiffs filed this adversary proceeding seeking immediate payment in full of the

amounts in their accounts, ahead of the customers granted high priority under the Bankruptcy

Code.  In the alternative, the plaintiffs seek to be treated the same as those customers.  A trial

was held on the two remaining counts of the plaintiffs' complaint.   At the close of the plaintiffs'

evidence, the trustee moved for judgment on partial findings, arguing that the plaintiffs had not

met their burden of proof.   The court agrees and will grant the trustee's motion.  The following

are the court's findings of fact and conclusions of law with respect to the motion.


1.        <u>Motion for Judgment on Partial Findings - Rule 7052(c)</u>

Rule 52(c) of the Federal Rules of Civil Procedure, applicable to this adversary

proceeding through Rule 7052 of the Federal Rules of Bankruptcy Procedure, provides for the

equivalent to a motion for a directed verdict when the court conducts a bench trial.   It states:


> If a party has been fully heard on an issue during a nonjury trial and the court finds
> against the party on that issue, the court may enter judgment against the party on a claim
> or defense that, under the controlling law, can be maintained or defeated only with a
> favorable finding on that tissue.

Fed. R. Civ. P. 52(c).

"Judgment is appropriate under Rule 52(c) where a plaintiff fails to make a *prima facie*

case . . . ."  The court neither draws special inferences in the nonmovant's favor, nor considers

the evidence in the light most favorable to the nonmovant.  Because the court is the finder of fact

in a bench trial . . . the bankruptcy judge has discretion on a Rule 52(c) motion to weigh evidence

and determine credibility."   *Follett Higher Education Group, Inc. v. Berman*, 427 B.R. 432, n. 1

(N.D. Ill. 2010).   If a bankruptcy court considers the relevant law and determines that the "facts

marshaled" by the plaintiff do not establish the elements of the plaintiff's legal theories, then

judgment may be entered under Rule 52(c).  *Id.* at 438.  The rule requires the court to make

findings of fact and conclusions of law regarding any such decision.

After hearing all of the evidence presented by the plaintiffs in their case in chief, the court concludes that the plaintiffs have failed to meet their burden of proof.   The trustee is therefore entitled to entry of judgment in his favor on Counts I and II.

2.    <u>Jurisdiction</u>

This is a core proceeding under 28 U.S.C. § 157(a)  to determine whether the funds transferred by the plaintiffs to Peregrine for the purposes of trading in foreign currencies and over-the-counter metals, as well as any other amounts attributed to their accounts with Peregrine, are property of the Peregrine bankruptcy estate.[1]   The parties have stipulated that the court has both core jurisdiction and the constitutional authority to enter a final judgment in this adversary proceeding.   The court concurs and finds that this is a core proceeding over which it has jurisdiction and the authority to enter a final judgment.

3.    <u>Counts I and II - Standard for Resulting Trust</u>

The plaintiffs filed a complaint with four counts seeking return of the funds attributed to their accounts at Peregrine.   Counts I, II, and III seek return of the full amounts in the plaintiffs' accounts.  Plaintiffs allege that they own the funds in their accounts under resulting trust or constructive trust theories, so the funds are not property of the bankruptcy estate.   In these three counts, the plaintiffs allege that they must be paid in full immediately, in effect giving them higher priority than customers who also own the funds in their accounts pursuant to various

_____

[1]Each plaintiff filed a proof of claim seeking the payment of all funds attributed to his account at Peregrine.

federal commodities laws and were granted high priority for distributions under the subchapter

IV provisions of chapter 7 of the Bankruptcy Code governing the liquidation of a commodity

broker, 11 U.S.C. § 761-767.   Count IV seeks a determination that the plaintiffs must be treated

the same as the customers who are given high priority under the Bankruptcy Code.  The court

recently granted summary judgment in favor of the trustee on Count IV of the complaint.  The

court concluded that the plaintiffs' retail foreign currency ("forex") and over-the-counter metals

("OTC metals") transactions do not fall within the definition of a "commodity contract" for

purposes of § 761(4) of the Bankruptcy Code, so they are not entitled to high priority

distributions.  The plaintiffs agreed at the beginning of the trial to the dismissal with prejudice of

Count III seeking imposition of a constructive trust.  Counts I and II remained for trial.

Counts I and II allege essentially the same claim - that the plaintiffs own equitable title to

the funds held in their accounts at Peregrine for the purpose of trading forex or OTC metals.[2]

Count I seeks a declaration that the funds transferred by the plaintiffs to Peregrine and otherwise

attributed to their forex or OTC metals accounts are not property of the bankruptcy estate under

section 541(d) of the Bankruptcy Code.  This section provides that if the debtor holds only legal

title but not equitable title to property as of the commencement of the bankruptcy case, then the

bankruptcy estate holds only legal title to the property.  11 U.S.C. § 541(d).

The trustee argues in his trial brief that § 541(d) does not provide a substantive basis for

concluding that a party has equitable title to property held by the debtor.  Any such property

rights must be established under non-bankruptcy law.  *See Rameker v. Peterson (In re Assoc.*

---

[2]Four plaintiffs - Michael Krall, David Beyerlein, Richard Medley and Secure Leverage
Group, Inc. - traded only in forex, not in OTC metals.  One plaintiff - Treasure Island Coins, Inc.
- traded only in OTC metals, not in forex.

*Enterprises, Inc.)*, 234 B.R. 718, 724 (Bankr. W.D. Wis. 1999); *Butner v. United States*, 440 U.S.

48, 55 (1979*); In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993). The trustee is correct. The

cases cited by the plaintiffs in their trial brief do not hold otherwise. In *Marrs-Winn Co., Inc. v.*

*Giberson Elec. (In re Marrs-Winn Co., Inc.)*, 103 F.3d 584 (7th Cir. 1996), and *State of Illinois v.*

*Chicago Title and Trust Co.*, 75 Ill. 2d 479 (1979), the parties had express trust agreements that

provided the basis for their claim to equitable title.   Here, the plaintiffs do not have a written

trust agreement.  Instead, they must rely on a resulting trust as the basis in non-bankruptcy law

for their claim to equitable title.   They allege in Count II that a resulting trust was created from

the Peregrine Customer Agreement ("Agreement") and related documents, as well as various

representations made by brokers at Foremost Trading, LLC, a Guaranteed Introducing Broker

("GIB") of Peregrine.  Thus, both Count I and Count II are based on the resulting trust claim

alleged in Count II.

    The Agreement provides that Illinois law applies, Ex. 8, Par. 30, and the parties agree that

Illinois law applies to the relationship between Peregrine and the plaintiffs.

    Under Illinois law, "'[a] resulting trust arises wherever the circumstances surrounding the

disposition of property raise an inference, not rebutted, that the transferor does not intend that the

person taking or holding the property . . . should have the beneficial interest therein.'" *Hong*

*Kong Electro-Chemical Works, Ltd. v. Less*, 539 F.3d 795, 798 (7th Cir. 2008), quoting from

*Kaibab Indus., Inc. v. Family Ready Homes, Inc.*, 111 Ill. App. 3d 965 (1983).  The burden of

proof rests upon the party seeking to establish the trust, and the evidence must be "clear,

convincing, unequivocal, and unmistakable."  *Id*.  The crucial element in creating a resulting trust

is the mutual intent of the  parties.  Intent can be proved by surrounding circumstances but the

proof must be clear and convincing.  *Id.* at 798, 800.  "A resulting trust 'comes into being at the instant the title vests or not at all.'"  *Id.* at 798, quoting *Suwalski v. Suwalski*, 40 Ill. 2d 492 (1968).   If the evidence produced can be construed in any reasonable way other than to create a resulting trust, the trust theory fails.  *Gary-Wheaton Bank v. Meyer*, 130 Ill. App. 3d 87, 91 (2nd Dist. 1984); *Nickoloff v. Nickoloff*, 384 Ill. 377, 383 (1943).

Plaintiffs argued for the first time at oral argument on the trustee's motion that a presumption of a purchase money resulting trust arises in their favor in this case.   Under Illinois law, a purchase money resulting trust may arise when one party purchases property with his own money but puts title in the name of another, usually a spouse or family member.  *See, e.g., In re Wilson's Estate*, 81 Ill. 2d 349 (1980).   In these situations, when the claimant supplied the consideration for the purchase, a rebuttable presumption of a resulting trust arises.  *See American Nat. Bank & Trust Co. of Rockford, Ill. v. United States*, 832 F.2d 1032, 1035-36 (7th Cir. 1987). As the *American National* court explained Illinois law regarding resulting trusts:

> The typical case is where one person supplies the money to buy something but title is placed in another person's name; the question is then whether the nominal purchaser intended the actual payor to have an ownership interest in the good. [Citations omitted]. Ordinarily the person claiming a resulting trust must establish the existence of the trust by clear and convincing evidence. . . . . But where the claimant supplied the consideration for the purchase, the probabilities shift and a rebuttable presumption of resulting trust arises.

832 F.2d at 1035-36.

Plaintiffs contend that in purchase money situations, Illinois courts look only at the intent of the party who provided the consideration for the purchase of the asset, not the person who received title to the property.   Illinois cases are somewhat contradictory on the standard in purchase money cases, but the court need not resolve the issue because this case does not involve

6

a purchase money scenario so no presumption of a resulting trust arises.   Indeed, the plaintiffs

were unable to articulate how this case involves purchase money used to acquire a particular

asset.  In a brief submitted at oral argument on the trustee's motion, plaintiffs claim that they paid

consideration to Peregrine but they fail to state what was purchased with that consideration.

This is because, as discussed below, the plaintiffs and Peregrine entered into a multifaceted

business relationship governed by a complex contract and pervasive federal regulation.  The

funds in the plaintiffs' accounts at Peregrine do not consist of assets purchased by Peregrine with

purchase money provided by the plaintiffs.  Instead, they consist of margin funds that were

required to be deposited for the plaintiffs to have the right to trade under the Agreement, plus any

gains earned from trading in their accounts.  The situation in this case bears no resemblance to

the purchase money resulting trust cases cited by the plaintiffs.   Illinois courts would not apply

the rather simplistic assumptions that arise in purchase money resulting trust cases to the

complex relationship between Peregrine and its customers.   No presumption of a resulting trust

arises in this case.

     In fact, under Illinois law, the opposite presumption arises.  Ownership of personal

property, including money, is presumed from the possession of it.  *See, e.g., People v. Four

Thousand Eight Hundred Fifty Dollars ($4,850) United States Currency*, 352 Ill. Dec. 33, 38 (4th

Dist. 2011); *Martin v. Martin*, 174 Ill. 371, 372 (1898); *Kondik v. Ebner (In re Standard Foundry

Products, Inc.)*, 208 B.R. 164, 167 (Bankr. N.D. Ill. 1997); *Almar Communications, Ltd. v.

Telesphere Communications, Inc., et al. (In re Telesphere Communications, Inc.)*, 167 B.R. 495,

502 (Bankr. N.D. Ill. 1994), *rev'd on other grounds*, 205 B.R. 535 (N.D. Ill. 1997).   Thus, the

transfers of funds by the plaintiffs to Peregrine created a presumption of ownership in Peregrine.

The burden is on the plaintiffs to rebut this presumption by clear and convincing evidence of a resulting trust.

Under Illinois law, the court must consider the circumstances surrounding the transfer of funds to Peregrine to determine whether a resulting trust was created in favor of the plaintiffs. This requires consideration of the terms of the Agreement, the regulatory context, and emails and other communications between Peregrine and its customers before the funds were transferred. Considering all of this evidence, the court finds that the plaintiffs have failed to establish by clear and convincing evidence that the parties intended that Peregrine would hold the funds transferred to it by the plaintiffs in trust. Judgment must therefore be entered for the trustee on Counts I and II.

4.    Testimony at Trial

The evidence presented by the plaintiffs at trial consisted primarily of the testimony of the three individual plaintiffs - Michael Krall, David Beyerlein, and Richard Medley, and the representatives of the two corporate plaintiffs - Christopher Olson for TIC, and Scott Shofner for Secure Leverage.  The initial direct testimony given by each was surprisingly brief and virtually identical on a few key points:  each never intended to pass title to Peregrine, each believed they still owned the funds, each said he (or his company) would own the gains and bear the losses of their trading, as well as any tax liabilities.  Little explanation was given for any of these statements.   There was no specific discussion of tax liabilities, and no testimony of how the plaintiffs actually treated the funds held by Peregrine for income tax purposes.  The testimony on all of these issues was formulaic and not persuasive.

8

Each plaintiff also testified that he believed the money attributed to his Peregrine account was still in Peregrine's forex bank account at Chase.   No plaintiff gave any testimony about the basis for this belief.  Each plaintiff also testified that he had no direct contact with Peregrine before opening his forex or OTC metals account and transferring funds to Peregrine.  None of the plaintiffs attempted to contact anyone at Peregrine to discuss the terms of the Agreement or any other matter.   All plaintiffs except for TIC dealt with Foremost, a GIB who helped them with the process of applying for forex accounts with Peregrine.  TIC, which already had a futures account with Peregrine, did not go through Foremost when opening a new account to trade forex.

Specific witnesses also testified as follows.

A.   <u>Michael Krall</u>

Krall testified that he understood that Peregrine could access the funds in his forex account only to deposit trading gains, withdraw trading losses, and pay commissions.  When asked why he thought forex funds would be given essentially the same protections as futures funds, he said he understood the forex funds would be held "separate from PFG" at a creditworthy bank.  He said he did not know the difference between "segregated" and "separate" accounts when he opened his account with Peregrine.   He had no direct contact with Peregrine, so no one from Peregrine told him that his funds would be protected like "segregated" funds, and nothing on the Peregrine web site stated that forex funds would be "segregated."

Krall also testified that he believed that the funds he transferred to Peregrine for forex trading would be maintained in a separate account in his name at Chase.   There was no basis in fact for this belief.  He transferred funds to an account at Chase identified as a Peregrine forex account, not an account opened in his name.  He did not fill out any documents from Chase to

open an account in his own name.  He never received bank statements or a Form 1099 from

Chase.  He did not ask his broker at Foremost why he was not getting the kind of information a

customer expects to receive from a bank at which he holds an account.  The court finds that Krall

knew when he opened his forex account that he did not have a personal bank account at Chase

and that funds were not held in the Peregrine account at Chase in his name.

Krall read and understood the Forex Risk Disclosure provided to him by Peregrine (Ex.

31).  He signed it on three separate occasions, once for each of the three accounts he opened for

trading forex.  He knew that it said that Peregrine could commingle his funds with its own funds,

and that he would have only an unsecured claim if Peregrine went into bankruptcy.   He testified

that the disclosure contained "a lot of legalese" about what may or may not happen.  The court

finds, however, that Krall understood the warnings and knew that the funds he transferred to

Peregrine would not be protected by law in any way.

Krall also received an email from Peregrine immediately after he opened each of his three

accounts.   The email specifically warned him that he would not have the protections that other

kinds of customers got in bankruptcy, which would give them priority over him in a bankruptcy.

It also warned him that he would be an unsecured creditor in the event that Peregrine went into

bankruptcy.   He read and comprehended this email before he transferred any money to

Peregrine.  He testified that he believed these statements were "legal fluff."  The court rejects this

testimony and finds that he knew that these statements were not merely "legal fluff," that he

knew they accurately described his rights, and that he chose to take the risk of transferring his

funds to Peregrine to trade in forex anyway.

10

Krall dealt with a broker at Foremost named Eric Klein.  Klein did not tell him anything
inconsistent with the Forex Risk Disclosure or the warning in the emails from Peregrine.  Krall
knew of no provision in the Agreement that required Peregrine to hold his funds in a segregated
account.  He knew that Paragraph 25 of the account required him to notify Peregrine immediately
in writing if any party made any representations to him that were different from any statements
he received from Peregrine, including the Forex Risk Disclosure and the email with the
bankruptcy warning.  Krall never notified Peregrine that Klein or anyone at Foremost told him
anything different from any communication he received from Peregrine.

      B.       <u>David Beyerlein</u>

Beyerlein opened a forex account through a broker at Foremost, Colson Hauser.
Beyerlein believed Hauser was an honest person and a good broker.   Beyerlein previously
opened a futures account with Peregrine through Foremost.  After he opened the forex account,
he did not personally trade in the account; instead he entered into an agreement with a company
that traded on his forex account.  He had no direct contact with Peregrine before opening his
forex account.  Hauser did not tell him that his forex account funds would be segregated or even
held separately by Peregrine.  He knew that any money he transferred to Peregrine would be held
in an account under Peregrine's name, not his name.  Hauser never told him that Peregrine would
act only as pass-through broker of forex.

Beyerlein read the Forex Risk Disclosure he received from Peregrine, and noted that it
said that his funds would have no regulatory protections.  He also saw the warning that Peregrine
could commingle his funds with its own funds.   This concerned him because he associated
commingling with potential fraud.  He discussed this issue with Hauser and was satisfied with

11

the answer so he signed the disclosure.   He also saw the warning in the disclosure that it would

not matter that the forex funds were held in a separate account - there were still no protections for

forex funds.  He thought that the warnings were about what "may" happen, and he thought the

possibility of a Peregrine bankruptcy was low.  He also knew that the lack of regulatory

protection and risk of commingling applied only to his forex account, not to his futures account.

He thus understood the difference between segregated funds and non-segregated funds that are

merely held in a separate account by Peregrine.  He also knew that his rights against Peregrine

would depend on the terms of the Agreement.  Overall, he viewed the investment as safe enough

to go forward, so he opened the account and then transferred money to Peregrine.

Beyerlein stated previously in his deposition that he did not know of any specific

provision in the Agreement that gave him ownership of funds he transferred to Peregrine,

because he had not focused on the "minutiae" of the documents.  At trial, however, he said that

he had now looked at the Agreement and that the references to collateral, margin, and customer

funds were clear enough to give him ownership of the funds he transferred to Peregrine.  He did

not refer to any specific contract provisions, and he never identified any provision of the

Agreement that he relied on when he transferred funds to Peregrine for forex trading.

Beyerlein also received an email from Peregrine soon after he opened his account that

contained login information.  It also contained the same warning about the treatment of forex

customer funds in bankruptcy that Krall received.  Beyerlein read this email before he sent any

funds for forex trading to Peregrine.

C.     Richard Medley

Medley opened an account with Peregrine through Foremost broker Bob Bunn.  Neither

Bunn nor anyone else told Medley that his funds with Peregrine would be segregated.  Instead, he

understood that the funds would be kept in a separate bank account owned by Peregrine.  He said

that he got the impression from the Agreement that the funds would be segregated, but that was

because he saw the funding instructions for futures accounts, which directed customers to wire

funds to a Peregrine bank account with "segregated" in the title.  He did not notice at that time

that these instructions did not apply to forex customers.   The documents he received with the

Agreement stated that forex funds should be sent to a different Peregrine account at Chase that

had "forex" in the title but not the word "segregated."

Medley signed the account opening documents on February 27, 2012.   He read and

signed the Forex Risk Disclosure on March 1, 2012.  He was concerned about the warnings in the

disclosure, especially that Peregrine could commingle his funds with their own funds.   He

decided on his own that the warnings did not apply to him, however, because of his interpretation

of the wiring instructions, and because he thought a lot of the wording in the disclosure was

"speculative" about what may or may not happen.  He also viewed the disclosure as a

"perfunctory document" that he needed to sign to open the account.[3]

---

[3]Each Forex Risk Disclosure signed by the plaintiffs for each of their forex accounts also
contained a table showing the percentage of customer-directed accounts (in which customers
make trading decisions themselves) that were profitable in the four quarters of the previous
calendar year.  Medley's disclosure showed a range from 22.07% to 36.65 % that were profitable
in the four quarters of 2011, while the percentage of customer-directed accounts that were not
profitable varied from 63.35% to 77.93%.  Ex. 24.  Thus, all of the plaintiffs were aware that
forex trading was very risky for many reasons.

After he signed the Forex Risk Disclosure and Peregrine opened his forex account, Medley received an email with his login information and the specific warning about the lack of protection for forex funds and the lack of priority in a Peregrine bankruptcy.   He read this warning and sent the funds to Peregrine's non-segregated forex account at Chase anyway.   He was thus aware that there were no protections for his funds and that the "separate" account at Chase was legally meaningless.

On March 8 and 9, 2012, after he sent funds to Peregrine, Medley asked his broker at Foremost, Bob Bunn, questions about his account via email.   He asked if the forex funds were in "a group account or segregated (like at MF Global?)."  Ex. 37.   Bunn responded: "It is currently held in your FX account which is not guaranteed.  We can move it to your futures account which [sic] segregated and protected."  Ex. 37.   Thus, Bunn confirmed what Peregrine previously told Medley in the log-in email - that forex funds were not segregated or protected like futures funds. Medley was therefore aware that the warnings he had received before he sent funds to Peregrine for his forex account did indeed apply to his forex account at Peregrine.  He chose not to transfer the funds in the forex account to his futures account so that he could continue trading forex. Medley never notified Peregrine in writing of anything that anyone at Foremost said to him that was inconsistent with any communication from Peregrine.

In another email exchange between Medley and Bunn in February 2013, after this adversary proceeding was filed, Bunn stated that he had told Medley the funds would be "separate," not "segregated."  Ex. 38.  Medley then admitted that he understood that his forex funds were "separate" but not "segregated."  Ex. 38.

Medley testified that Peregrine never actually commingled forex funds with its operating

funds, but he gave no basis for this belief.  He admitted that he had no access to Peregrine's

account documents to know whether this was true or not.

      D.     <u>Christopher Olson - Treasure Island Coins, Inc.</u>

Christopher Olson was the corporate representative at trial for TIC, and he testified as its

CEO and a shareholder.  TIC originally opened a futures account with Peregrine in 1992.  Ex.

56.  In May 2010, TIC opened an OTC metals account with Peregrine, so at that time it had both

a futures account and an OTC metals account.  It never traded forex.  At all times that it had

accounts with Peregrine, TIC was an Eligible Contract Participant ("ECP"), a sophisticated

investor with a high net worth.

The trial exhibits do not include a copy of the Agreement signed by TIC, but the parties

stipulated that TIC and Peregrine entered into the Agreement.  Pretrial Stmt., Stip. 17.  Although

TIC was not trading in the forex market, the funds it transferred to Peregrine were held in

Peregrine's forex account at Chase.   Olson explained that OTC metals trading is similar to forex.

Instead of engaging in transactions involving two sovereign currencies (*e.g.,* U.S. dollar and

British pound), OTC metals are spot purchases pairing a sovereign currency with a precious

metal, such as gold or silver.   The transactions were with the same banks that deal in forex, and

used the same trading technology and infrastructure.

Olson dealt directly with Peregrine in opening the OTC metals account; he did not go

through Foremost brokers.  No one at Peregrine told him that funds transferred to Peregrine for

OTC metals trading would be "segregated."  He believed they would be kept in a separate bank

account, but he knew the account would be owned by Peregrine.  He noted in his testimony that

"segregated" and "separate" were "semantically similar," but he knew that the OTC metals funds would not be segregated like the funds in his futures account.  He also knew that funds he transferred to Peregrine for trading OTC metals would go into Peregrine's forex account with Chase.

Before he transferred funds to Peregrine's forex account with Chase, Olson received an email with his login information.   Near the top of the email was a line in large letters stating: "PFGBEST.com New Live Forex Account."   Ex. 57.   The email contained the same warning received by the other plaintiffs regarding the lack of protection for forex funds held by Peregrine and the lack of priority in a Peregrine bankruptcy.   Olson understood that the funds he transferred to Peregrine for OTC metals trading would be kept in the Peregrine forex account at Chase, so he knew that this forex warning applied to his OTC metals funds.  As an ECP trading off-exchange OTC metals, he knew he had no regulatory protections of any kind for his OTC metals trading.  *See* Memorandum Opinion, May 4, 2014, p. 25-26.  After reading and signing the Forex Risk Disclosure, and reading the email warning about the lack of protection of TIC's funds at Peregrine, Olsen transferred funds to Peregrine's forex account at Chase for the purpose of trading in OTC metals.   Olson never testified that any provision in the Agreement led him to believe at the time he transferred money to Peregrine's forex account at Chase that TIC would own money in it after the transfer.

TIC opened a second forex account in 2011.  Olson signed the same Forex Risk Disclosure and got the same email with the login information and the specific warning about the lack of protection for forex funds held by Peregrine.

16

Olson testified that he viewed the email warning language like a box on a website where you have to click "agree" to be admitted, suggesting that he did not really pay attention to its terms. The court was not persuaded by this testimony. Olson is a very sophisticated investor who knew the risks he was taking by transferring this money to Peregrine. He accepted those risks, which included that he could lose all the money in the OTC metals account if Peregrine went into bankruptcy.

Olson also briefly explained why he was not surprised that his funds for OTC metals trading went into Peregrine's forex account. He said that funds had to be deposited with the "prime broker," Chase, to make sure that there was proper margin deposited against all trades dealt through Peregrine. He also said that the prime broker requires collateral before it will allow someone to enter into a trade with them; it is essentially extending credit to the customer so the customer has to have collateral on deposit. He believed that Peregrine was not the counterparty to his trades so it "stood to reason" that they were not utilizing any of his funds except to back up his trades, like a futures account. He knew, however, that the funds in the forex account with Chase were aggregated - meaning that Chase did not maintain separate sub-accounts identified to specific Peregrine customers. He therefore knew that Chase was not matching funds attributed to TIC's account with any trades placed for TIC. Olson also gave no explanation for his brief statement that it was Chase, not Peregrine, who was in effect extending credit to the customer. Without any explanation of the basis for his testimony, the court was not persuaded that he was correct.

17

E.     Scott Shofner - Secure Leverage Group, Inc.

Scott Shofner is president and sole shareholder of Secure Leverage Group, Inc.  He directed all trading by Secure Leverage.  It has traded forex for 10 years through Peregrine and other forex dealers.  He opened the first account with Peregrine in April 2011 through Bob Bunn at Foremost.

Shofner said he was looking for an FCM that was not a counterparty because of the inherent conflict of interest.  He said he liked Peregrine because he believed it would act as a flow-through to the counterparty, which was Chase.  He testified that, as a retail customer, he could not go directly to Chase; he needed to go through someone with a license, like Peregrine, to get to the "market maker."  He also testified that most forex dealers act as a market-maker or counterparty, and there is a lot of risk associated with that.  He stated that, with Peregrine, he believed the only risk was of failure of the counterparty, not the FCM.  Shofner testified that he was sure that Peregrine was not the counterparty based on the Agreement, not anything Bob Bunn told him.   He referred to one sentence in Paragraph 7 of the Agreement that explains that forex is traded on an interbank system, not regulated exchanges, so the counterparty is a bank. He testified that he therefore believed the counterparty to trades he placed would be a bank, not Peregrine.   He did not acknowledge that a few lines later in the same paragraph, the Agreement expressly states that Peregrine is the counterparty in every forex transaction with a customer.

Shofner also pointed to provisions in Paragraph 8 of the Agreement discussing collateral that Peregrine is carrying for the customer.  He testified that, based on these two provisions, he thought the funds he transferred to Peregrine were his, and that Peregrine only had a lien and a right to setoff.   He also testified that he believed his funds were "segregated" because they were

18

held in a "separate" account at Chase.   He further stated that you have to put the money with the market maker if you are a pass-through broker, that there is no other way to do it.  He therefore claimed that Peregrine could not commingle or steal his funds.  He pointed out that Wasendorf, the founder of Peregrine, stole money out of the futures segregated accounts at Peregrine, not the forex accounts.   He said that this is because the forex trading accounts are audited every day so it was not possible to steal from them.   There was no foundation for any of this testimony; plaintiffs' counsel did not attempt to establish the basis for Shofner's claimed knowledge on these topics.   His brief, unsupported statements regarding what Chase would require to carry out trades and the possibility of someone taking money from the accounts for purposes other than forex transactions were not persuasive.   He admitted he had no information about or access to Peregrine's books and records and no access to Chase bank statements.

The court found more credible the testimony of Brenda Cuypers, who testified by deposition, as discussed below.   Based on her testimony, the court finds that Peregrine could and did transfer funds from its forex account at Chase to pay obligations other than their forex liabilities owed to forex customers.  She also noted that Wasendorf was probably able to steal from segregated accounts because they were deposited with another bank where he had more control, not because of any inherent difference between forex and futures trading. This explanation was also more credible.

Shofner opened four separate forex accounts with Peregrine for Secure Leverage.   For each account, he signed a Forex Risk Disclosure and received an email with account login information that contained the specific warning received by the other plaintiffs that funds transferred to Peregrine for forex trading would have no protections in bankruptcy. Ex. 52.   He

read each notice before transferring funds to Peregrine but decided they did not apply to him.  He

testified that he knew the notices said forex funds would not be protected in bankruptcy but that

those notices did not matter because "his money" was with the "market maker," i.e. Chase, and

he knew that the risk resided with Chase, not with Peregrine.  He said that the warnings were just

a "generic statement" and "legal mumbo jumbo."  He also testified that he talked to Bob Bunn at

Foremost about the warnings in the Forex Risk Disclosure, but that Bunn told him that he could

ignore them as "generic."  The plaintiffs did not call Bob Bunn as a witness or offer his

deposition testimony in their case in chief.  Shofner never told Peregrine that Bunn told him

anything different than the communications he received from Peregrine, which would include the

Forex Risk Disclosure and the account log in email with the warning about the lack of protection

in a bankruptcy.

　　　The court was not persuaded by Shofner's testimony that he believed there was no risk in

transferring funds to Peregrine and that the only risk was that Chase would fail.   Those supposed

beliefs were directly contradicted by the Forex Risk Disclosure and the email he received

discussing the risk if Peregrine went into bankruptcy.   He was an experienced forex trader who

knew exactly what risks he was taking in dealing with Peregrine and decided the risks were

worth the potential profit.    The court also rejects his testimony that Chase being a market maker

eliminated any risk from a Peregrine insolvency.   He gave no basis for concluding that having

money in an account at owned by Peregrine at Chase eliminated the risk that he could lose money

in his forex account if Peregrine went into bankruptcy, and it defies logic.

　　　Through an error made by Foremost when they sent him wire instructions for transferring

funds to Peregrine, Shofner was directed to send money for forex trading to a Peregrine account

that was designated as "segregated" for futures customers.   This was a mistake.  For the first

week after he sent money to the Peregrine futures account, Peregrine could not find his money.

His money was then transferred to the forex account.  Shofner knew the money he sent was

intended to be held in Peregrine's forex account at Chase and was held in that account, not in a

segregated account used only for futures customers.

       F.     <u>Brenda Cuypers - Former Peregrine CFO</u>

Brenda Cuypers, Peregrine's former Chief Financial Officer, was unavailable at trial so

both parties submitted portions of her deposition testimony into evidence.  Cuypers testified that

Peregrine kept funds attributed to forex customers in a separate account at Chase because "for

our purposes it was easier if we had separate bank accounts for the Forex customers."   Ex. 4, p.

18.   She did not testify that they were kept in separate accounts because they were required by

the Agreement or any law to keep the funds "separate."   She testified that the forex account was

not "commingled" with other accounts of Peregrine. *E.g.*, Ex. 4, p. 19.   She also testified,

however, that Peregrine could and did in fact transfer funds from the forex account at Chase to

other accounts to use for other purposes so long as the amount in the forex account exceeded

Peregrine's total retail forex obligations.   She defined the "total retail forex obligation" as "the

amount owed to the Forex customer."  Ex. 4, p. 27.   The amount owed to the forex customer

included "cash, open trade equity, FX securities."  Ex. 4, p. 27.   She testified that if a customer

wired funds to the forex account at Chase, they remained there "unless they were - the funds

were needed for margining at one of the banks or one of the clearing firms.   And on some

occasion, if we had access, access upon doing the Forex separation reports there was always an

access. . . . We would move it to house to pay commissions and other things."  Ex. 3, p. 36-37;

Ex. 4, p. 29-30.  She also testified that customers would not be notified if the funds were so

transferred.  Ex. 3, p 37.   Based on her testimony, which was measured and based on her

personal knowledge as CFO of the company, the court concludes that Peregrine did in fact move

money from the forex account to use for its own purposes as long as the amounts in the account

exceeded the total of their forex liabilities at any given time.

Cuypers also testified that in terms of money "owed to" a customer, not "owned by" a

customer.  *E.g.,* Ex. 4, p. 27-28.   She never testified that forex customers owned the money

attributed to their forex accounts.

*   *   *   *   *

Each plaintiff was an intelligent and sophisticated person who had read the Agreement

before signing it.  Each plaintiff read a copy of the Forex Risk Disclosure and signed his name at

the bottom of it under a sentence that declared, "I hereby acknowledge that I have received and

understood this risk disclosure statement."  Ex. 31, p. 2.   Each also admitted that he received an

email when he opened the account containing a direct statement that forex funds at Peregrine

would not be safe in the event of a bankruptcy, and that other customers of Peregrine would get

priority over forex customers in a bankruptcy.    Each plaintiff stated in his own way that he

thought this direct warning and the warnings in the Forex Risk Disclosure did not apply to his

funds.   None of these explanations was persuasive.  Instead, each of the plaintiffs understood

these express warnings and decided to take the risk that Peregrine would remain solvent before

transferring funds to Peregrine.   Although some plaintiffs also testified that the Agreement

provided that they would retain ownership of the money they transferred to Peregrine, as

discussed below, there is no such provision in the Agreement.  The court was not persuaded by

22

their testimony that they believed they owned the funds they transferred to Peregrine because of

any provision in the Agreement.


5.    Customer Agreement

The plaintiffs argue that the Agreement supports their claim that they own the funds in

their accounts at Peregrine.  The Agreement is a standard form contract that was used for

customers trading any kind of contract or transaction through or with Peregrine, not just forex or

OTC metals.  It is remarkably poorly drafted for the complex relationship between Peregrine and

its customers, and the many types of trading in which its customers engaged.  Some provisions

apply only to forex, some apply only to exchange-traded transactions like futures or other

specific kinds of transactions, and some apply to all customers.   No provisions apply only to

OTC metals.  The Agreement does not expressly identify which provisions apply to which

particular types of trading.

As discussed above, some plaintiffs testified or suggested that the Agreement provides

that forex customers retain ownership of any funds transferred to Peregrine, that the funds would

be kept "separately" at Chase or another large bank, and that Peregrine could do nothing with

those funds except apply them to trading losses or commissions.   The Agreement does not

provide for any of these things.  In fact, no provision expressly states who owns any property

transferred by any customers to Peregrine for any type of trading.  It contains no provisions

requiring segregation of any customer funds in compliance with the Commodities Exchange Act

("CEA") or CFTC regulations that apply to certain customers (not forex or OTC metals

customers).   It also has no provisions requiring Peregrine to hold any funds from any customers

in any particular types of accounts or with any particular limitations on how Peregrine may use

the funds.  In fact, the Agreement never even expressly provides for when customers may

withdraw funds from their accounts.  It covers only some aspects of the relationship between

Peregrine and its forex customers.   It never expressly mentions OTC metals at all, but those

transactions would presumably fall within the Agreement as "any similar instruments which may

be purchased or sold by or through PFGBEST for customer accounts."  Ex.8, first paragraph.

     The most important provisions of the Agreement regarding forex trading and money held

by Peregrine are in Paragraphs 3, 7, 8, and 20 of the Agreement.

### A.    Paragraph 7 - Forex

     Paragraph 7 of the Agreement is entitled "Currency Forex Trading" and contains most of

the provisions regarding forex trading.  It does not address funds transferred from customers at

all.   Instead, it explains the off-exchange, inter-bank forex market, and then states that Peregrine

will be the counterparty in all transactions.  It also states that Peregrine will set all prices that will

be used in trading, valuations of customer positions, and determining margin requirements.

Nothing in Paragraph 7 supports the plaintiffs' contention that they own funds transferred to

Peregrine for forex trading.

### B.    Paragraph 3 - Margin/Deposit Requirements

     Plaintiffs also pointed in oral argument to Paragraph 3 of the Agreement, entitled

"Margin/Deposit Requirements." Ex. 8, Par. 3.   The Agreement never defines "margin," and

never provides for the deposit of a specific amount or percentage of margin funds with Peregrine.

Paragraph 3 begins with a discussion of potential additional margin funds before discussing

initial margin deposits.  Only later in Paragraph 3 does it finally provide that,  "[a]s security for

Customer's obligation to PFGBEST hereunder, Customer shall provide to and maintain with PFGBEST margin and/or collateral in such amounts and in such forms as PFGBEST, in its sole and absolute discretion, may from time to time require." Ex. 8, Par. 3.  This provision requires customers to provide margin, but it does not state who will own any funds or other collateral held by Peregrine as margin.

The only other provision in Paragraph 3 referred to by plaintiffs is a statement that:

"For margin purposes associated with foreign currency transactions, Customer has authorized PFGBEST to convert Customer's funds into and from such foreign currency at a rate of exchange determined by PFGBEST, in its sole discretion, on the basis of the then prevailing money market rates."

Ex. 8, Par. 3.

Plaintiffs argue that this provision supports their theory that the plaintiffs retained ownership of margin funds.  Because the sentence is in the margin provision and deals with conversion of currencies, however, it appears to permit Peregrine to convert funds deposited in a margin account in one currency to another currency as needed and at rates determined by Peregrine.   To the extent the plaintiffs intended to focus on the phrase "Customer's funds," this phrase does not connote that customers still owned the funds.  In this context, it suggests simply "funds from the customer," meaning funds transferred by customers to Peregrine to meet margin requirements.  It says nothing about who owns margin funds deposited by forex customers or any other type of customer.

Plaintiffs also suggested at oral argument that the term "margin" itself connotes that the customer owns the funds.  They submitted no evidence supporting this contention and they cited no authority for it.   "Margin" is an important term of art in the commodities world.  It generally refers to amounts that a customer must deposit with a broker or dealer that will be used to cover

25

any trading losses incurred by the customer.   Referring to funds as "margin," however, does not establish ownership of the funds.  Funds could be considered margin whether they were protected by the segregation requirements and therefore by law remained property of the customer, or whether they were not so protected, like forex and OTC metals funds, and could be owned by the forex dealer.

> C.      Paragraph 8 - Collateral

Plaintiffs rely principally on Paragraph 8 of the Agreement, entitled "Collateral," to argue that the plaintiffs and Peregrine intended that the funds in forex or OTC metals customers' accounts were owned by the customer.  In their written opening statement, plaintiffs referred to Paragraph 8, stating that the court "ruled affirmatively" in its opinion denying the trustee's motion to dismiss that the agreement "recognized and stipulated that customer funds remained property of the customer while being held in Peregrine customer accounts."  Plaintiffs' Opening Stmt., p. 2.  This is not correct.  In rejecting an argument made by the trustee for dismissing the case based on one sentence in Paragraph 8, the court stated that Paragraph 8 contained language that was in conflict with the trustee's contention and that supported the plaintiffs' argument against dismissal.  The court never concluded that Paragraph 8 gave the plaintiffs any particular rights.

Paragraph 8 begins:

Collateral
All funds, securities, commodities, commodity futures contracts, commodity option contracts, and other property of customer which PFGBEST or its affiliates may at any time be carrying for Customer ..., or which may at any time be in PFGBEST's possession, control, or carried on PFGBEST's books for any purposes, including safekeeping, are to be held by PFGBEST as security and subject to a general lien and right of setoff against liabilities of Customer to PFGBEST....

It also provides that Peregrine can transfer funds among a customer's accounts, and gives Peregrine:

> the right to pledge, repledge, hypothecate, sell or purchase, invest or loan, either separately or with the property of other Customers, to itself as a broker or to others, as securities or other property of Customer held by PFGBEST as margin or security.

Plaintiffs never identify any particular language in Paragraph 8 that they contend provides that they retain title to any property transferred to Peregrine, and there is no such direct language. Some language in the paragraph implies that collateral Peregrine holds from customers is still owned by the customer, because it gives Peregrine a security interest in the property, rather than declaring that Peregrine owns the property.

The problem with the plaintiffs' argument, however, is that the first sentence of Paragraph 8 makes it clear that it applies only to "property of Customer."   It provides that all "funds, securities... and *other property of customer* are held as security and subject to a general lien and right to setoff . . . ."   Thus, for Paragraph 8 to apply, the property in question must first be determined to be property of the customer after the transfer to Peregrine.  Nothing in Paragraph 8 or any other part of the Agreement addresses when property is considered "property of Customer" after it is transferred to Peregrine.  The court must therefore look to applicable laws to determine who owned property transferred to Peregrine as margin for trading.

As discussed in more detail below, the Agreement operated in the highly regulated framework provided by the CEA and CFTC regulations, which control on the issue of ownership of funds in certain kinds of customer accounts.  These provisions dictate that property transferred to an FCM for certain types of transactions (like futures) remain property of the customer and

cannot be used by the FCM for its own purposes.[4]  It is these laws, not the Agreement, that give customers protected by the segregation requirements an ownership interest in the funds held by Peregrine.  Customers engaging in forex and OTC metals trading have no such ownership rights imposed by law, so by implication and under the Illinois presumption that funds are owned by the party possessing them, they have no ownership interest in the funds they transferred to Peregrine.  Paragraph 8 regarding collateral, therefore, applies only to property of customers protected by the segregation requirements, and not to the funds transferred by the plaintiffs for forex or OTC metals.

### D.    Paragraph 20 - Customer's Acknowledgements

Paragraph 20 of the agreement, entitled "Customer's Acknowledgments," supports this conclusion.  It expressly refers customers to the Forex Risk Disclosure, which explains that forex customer funds are not protected in any way by law.  One of the acknowledgements made by the customer in Paragraph 20 refers to forex trading as follows: :

> If Customer trades through the Forex market, Customer may not be afforded certainty of the protective measures provided by any domestic futures exchange, including the right to arbitrate a dispute with a counterparty.  For additional risk factors associated with Currency forex, Customer should refer to the Currency Forex Risk Disclosure Statement, a copy of which has been provided to Customer.

The first sentence informs customers they do not get protections provided by domestic futures exchanges.  The second sentence directly refers forex customers to the Forex Risk

---

[4] *See, e.g.,* 7 U.S.C. § 6d(a)(2) (FCM shall treat all money, securities and property received to margin, guarantee or secure the trades or contracts of any futures customer as "belonging to such customer."); 17 C.F.R. § 30.7(b), (e)(2) (money, securities and property of foreign futures customers may not be commingled with any proprietary account); 17 C.F.R. § 31.12(a) (leverage customer funds shall be treated and dealt with as "belonging to that leverage customer" and segregated); 7 U.S.C. § 6d(f) (FCM shall treat and deal with money, securities and property of any swaps customer as "belonging to the swaps customer.").

Disclosure.   This important document drafted by the CFTC tells each forex customer in strong

terms that the commodities laws provide no protections for the funds they deposit with an FCM

or other forex dealer.  As discussed below, it expressly warns customers that the FCM can

commingle the customer's funds with its own funds and that the customer may have only an

unsecured claim in bankruptcy.  By directing forex customers to this disclosure, Peregrine was

expressly referring to the regulatory framework around which the contractual provisions were

drafted and that would govern in many ways the relationship between Peregrine and its

customers.

        E.      <u>Right to Withdraw</u>

The plaintiffs also testified that they had the right under the Agreement to withdraw funds

from their account as long as there was enough money to cover open positions and commissions

owed to Peregrine.  They argue that this right demonstrates that Peregrine treated the funds in

their accounts as their money.   They cite no provision of the Agreement, however, that expressly

grants this right, and it would not establish that they own the money in any event.

First, the Agreement does not expressly give the customer the right to withdraw funds at

will.  The only reference to a right to withdraw is in Paragraph 26 regarding joint accounts, which

lists "the right to receive or withdraw money" as the right of a joint tenant.  There is no parallel

right granted to the primary owner of the account, and no parameters are set for the right to

withdraw.  Paragraph 32 addresses termination of an account.  It states that a customer may

terminate the Agreement only when he has no open commodity positions and no liabilities held

or owed to Peregrine.  It also gives Peregrine the right to liquidate positions in the customer's

account upon termination.   It does not, however, expressly states that the customer can withdraw

any amounts in excess of what is owed to Peregrine upon termination of the Agreement or at any other time.

Second, assuming that the customers had the right to withdraw funds despite the failure of the Agreement to define it in clear terms, this would not establish that the customers owned the funds.  It would establish only that they had an implied contractual right to be paid the balance in their account after all amounts owed to Peregrine under the Agreement were deducted.  Such a right to withdraw would be entirely consistent with Peregrine owning the funds in the plaintiffs' accounts.  The relationship would be similar to that between banks and their customers.  Customers deposit money in a bank and think of it as "their money" that the bank is merely holding for them.  In reality, however, the deposit of money with a bank effects a transfer of title to the bank, which then owes a contractual  obligation to pay the customer upon demand up to the full amount deposited.   Banks do not hold money in trust for customers, though customers can withdraw funds at any time.  *Durkee v. Franklin Savings Assoc.*, 17 Ill. App. 3d 978, 981 (2nd Dist. 1974) ("A deposit in a bank is presumed to be a general deposit; and the moment the money is deposited it actually becomes the property of the bank.")  *See also Paskas v. Illini Federal Savings & Loan Assoc.*, 109 Ill. App. 3d 24, 31 (5th Dist.  1982) ("a debtor-creditor relationship exists between the depositor and the bank and the contract between the two controls their relationship."); *Menicocci v. The Archer National Bank of Chicago*, 67 Ill. App. 3d 388, 391 (1st Dist. 1978) (same).  In the same way, the right of Peregrine customers to withdraw funds from their accounts as long as there are sufficient funds remaining in the account to cover all amounts owed to Peregrine does not establish that the customers owned funds in the account.

6.      Regulatory Framework

The Agreement must be considered in the context of the heavy regulation of commodities trading by Congress and the CFTC.   The court discussed the history of commodities regulation and the important differences between forex and OTC metals and other types of trading in its Memorandum Opinion issued May 7, 2014, granting summary judgment.   The court incorporates by reference the discussion of this area of the law generally, and in particular the discussion of  the protections provided to customers whose funds must be segregated and those whose funds need not be segregated.  Plaintiffs do not dispute that forex and OTC metals customers were not protected by the segregation requirements or any other provisions in the CEA and CFTC regulations.

Any contract entered into between an FCM and its customers must necessarily reflect the extensive federal regulation of commodities trading.  Paragraph 2 of the Agreement expressly states that Peregrine "is obligated to comply with all applicable laws and regulations including those of regulatory and self-regulatory organizations."  Ex. 8, Par. 2.  It also provides that customers "shall be bound by all applicable laws, rules and regulations, including the Commodity Exchange Act, as amended, the Commodities Futures Trading Commission regulations thereunder, . . . ."  Ex. 8. Par. 2.   These applicable commodities laws control directly regarding the ownership of funds from customers protected by the segregation requirements, and by implication regarding funds not protected by segregation requirements.  The lack of a provision in the Agreement stating who owns funds transferred to Peregrine, or providing for segregation or any other particular treatment of customer funds,  can only be explained by this controlling law on the subject.  The Agreement assumes that applicable laws - the segregation

requirements - determine ownership of funds received from and accruing to the accounts of customers. Paragraph 8 then grants rights to Peregrine against customers who own those funds under the segregation requirements. It is the segregation requirements, not any provision in the Agreement, that make the collateral discussed in Paragraph 8 the property of the customer.

To the extent the segregation requirements do not apply, however, there is no basis for concluding that customers own funds transferred to Peregrine. To the contrary, under Illinois law, as discussed above, the party in possession of money is presumed to own it. Thus, federal law permits Peregrine to take ownership of non-segregated forex and OTC metals funds and do with them as it chooses, Illinois law presumes that Peregrine owns the funds by virtue of its possession of them, and there is no contractual provision saying otherwise. Under the Agreement and applicable law, therefore, Peregrine owns funds transferred to it by forex and OTC customers.

7.    Forex Risk Disclosure

The Forex Risk Disclosure, which FCMs must provide to every retail forex customer, supports this conclusion. Each plaintiff testified that he received this disclosure from Peregrine, and that he read it, understood it, and signed it before he transferred any funds to Peregrine. This document describes the significant risks involved in trading forex. It warns that customers can rapidly lose all the funds they deposit with their forex dealer and much more, that trading is not on a regulated market or exchange, and that the forex dealer is the counterparty who has a direct conflict of interest with the customer.

Regarding deposits given to forex dealers by their customers, Paragraph 3 states as

follows:

> (3) YOUR DEPOSITS WITH THE DEALER HAVE NO REGULATORY
> PROTECTIONS.
> All of your rights associated with your retail forex trading, including the manner and
> denomination of any payments made by you, are governed by the contract terms
> established in your account agreement with the futures commission merchant or retail
> foreign exchange dealer.  Funds deposited by you with a futures commission merchant or
> retail foreign exchange dealer for trading off-exchange foreign currency transactions *are
> not subject to the customer funds protections* provided to customers trading on a contract
> market that is designated by the Commodity Futures Trading Commission. *Your dealer
> may commingle your funds with its own operating funds or use them for other purposes.
> In the event your dealer becomes bankrupt, any funds the dealer is holding for you in
> addition to any amounts owed to you resulting from trading, whether or not any assets
> are maintained in separate deposit accounts by the dealer, may be treated as an
> unsecured creditor's claim.*

Ex. 31 (emphasis added).

This disclosure says in the plainest terms that, under applicable federal law,  FCMs can

use funds held for forex customers for any purpose and they are not given any of the same

protections (*i.e.*, segregation) given to funds held for trading on designated markets.  In other

words, the FCM is not holding these funds in trust for the customer, the FCM can use them as it

sees fit, and in the event of bankruptcy the customer will have no special priority.   Each plaintiff

testified that he read this disclosure before his account was opened and before he transferred

money to Peregrine for forex or OTC metals trading, but decided that it did not apply to his

funds.  Each said, in effect, that this document was "generic" and merely described "in

generalities" what *could* happen hypothetically, not what would happen to their funds because

they were protected under the Agreement.  As discussed above, however, the Agreement contains

no such protections.

33

8.      Account Login Emails with Forex Warning

After receiving the Forex Risk Disclosure, the plaintiffs each received another explicit

warning about their forex funds, which could not reasonably be written off as mere "generalities"

that did not apply to Peregrine.  After each plaintiff signed all the account opening documents,

including the Forex Risk Disclosure, he received an email from Peregrine.  It contained the

customer's login information (a username and password) and other information that each

plaintiff acknowledged receiving.   The email contained language regarding Peregrine's rights in

the funds transferred from forex customers that directly contradicted the plaintiffs' claimed

beliefs that they continued to own funds transferred to Peregrine.   The email stated as follows:

> Foreign Exchange ("Forex") transactions entered into with PFGBEST are not traded on
> an exchange.   Therefore, under the U.S. Bankruptcy Code, your funds may not receive
> the same protections as funds used to margin or guarantee exchange-traded futures and
> options contracts, which receive a priority in bankruptcy.   Since that same priority has
> not been given to funds used for off-exchange forex trading, if PFGBEST becomes
> insolvent and you have a claim for amounts deposited or profits earned in transactions
> with PFGBEST, your claim may not receive a priority.  Without a priority, you are a
> general creditor and your claim will be paid, along with the claims of other general
> creditors, from any monies still available after priority claims are paid.  Even customer
> funds that PFGBEST keeps separate from its own operating funds may not be safe from
> the claims of other general and priority creditors.

This warning is directly contrary to the plaintiffs' claimed beliefs that they owned the

funds in their accounts.  It means that Peregrine owns the funds in forex customer accounts,

because that is the only way that customers would be treated as general unsecured creditors in a

bankruptcy case.  Although the email referred to the Bankruptcy Code and not the CEA and

CFTC regulations, as discussed in the summary judgment opinion, the protections of the

Bankruptcy Code, the CEA, and CFTC regulations are all related and intended to be consistent.

The segregation requirements align with the types of trading that fall within the definition of a

"commodity contract" under § 761(4) of the Bankruptcy Code, which in turn determines what is

"customer property" that gets high priority for distribution under the Bankruptcy Code.  Forex

customers could be treated as general unsecured creditors only if Peregrine owned the funds in

the forex accounts, and owed the customers merely a contractual obligation to return funds in

excess of amounts owed to Peregrine for commissions, losses or other charges.  Then their

claims would be treated as ordinary contract claims like the rest of Peregrine's unsecured

creditors.  If, on the other hand, the forex customers owned the funds in their accounts, they

would have priority over general unsecured creditors. [5]   Thus, the email made it clear that forex

customers did not own funds in their accounts with Peregrine.  The email also expressly warned

the plaintiffs, as did the Forex Risk Disclosure, that the fact that forex funds were maintained in

separate bank accounts by Peregrine would mean nothing in bankruptcy.

As with the Forex Risk Disclosure, each plaintiff admitted that he read this language

before he transferred funds to Peregrine for forex or OTC metals trading.   Some of the plaintiffs

attempted to brush off this email as inconsequential boiler-plate that did not apply to them,

similar to their testimony regarding why they thought they could disregard the warnings in the

Forex Risk Disclosure.   This paragraph, however, was specific to Peregrine.  It discussed what

would happen if *Peregrine* - not some other forex dealer who might have a different contractual

relationship with its customers - went into bankruptcy.   The court did not find credible the

---

[5]Even if forex customers owned the funds in their accounts, they would not get priority over customers who are entitled to distributions of "customer property" under § 766(h), 11 U.S.C. § 766(h).   These other customers also own the funds in their accounts pursuant to the segregation requirements, and Congress gave them high priority for distributions in § 766(h) that was not given to forex or OTC metals customers.  These other customers would therefore have higher priority than forex or OTC metals customers who owned the funds in their accounts under their customer agreement but did not qualify for high priority distributions under § 766.

plaintiffs' attempts to explain away the significance of this warning.  The court finds that each

plaintiff understood upon reading this warning before he transferred funds to Peregrine that his

funds could be lost if Peregrine went into bankruptcy, that customers engaged in other types of

trading would get priority over him, and that he would be treated as an ordinary unsecured

creditor in a bankruptcy.   Each therefore knew that he would not continue to own funds

transferred to Peregrine for forex or OTC metals trading.


9.      Separate v. Segregated

Despite these warnings about the lack of protection for funds in "separate" accounts,

plaintiffs contend that the fact that their funds were kept in a separate forex account at a major

bank supports their claim that they own the funds in their accounts.  The plaintiffs are correct that

Peregrine kept the funds from forex customers in a separate account at Chase that contained only

forex funds.   This account was owned by Peregrine, and was named in Chase's records as "PFG,

Inc. Forex Funds Account."  Pretrial Stmt., Stip. 42.   It was an "aggregated account," meaning it

held funds of many or all forex customers in aggregate.   Chase did not maintain separate "sub-

accounts" for individual Peregrine forex customers.  Pretrial Stmt., Stip. 43.  Peregrine internally

kept track of the amount of funds transferred to them and deposited in the Chase forex account

from individual forex customers.  The fact that Peregrine kept the plaintiffs' funds in a separate

account at Chase for forex customers proves nothing, however, about ownership of the funds.

As plaintiffs admit, the Agreement did not require Peregrine to hold any customer funds

in any particular way, in any particular account, or at any particular institution.  The Agreement

requires neither separation nor segregation of any funds from any customers.  Thus, nothing in

36

the Agreement supports the plaintiffs' suggestion that they owned funds because they were kept in the separate forex account.

Plaintiffs also failed to introduce any other evidence that supports their argument that they owned the funds because they were in a separate account at Chase. No plaintiff testified that any broker at Foremost or anyone at Peregrine ever told them that their funds would be "segregated," or that "separate" meant "segregated." Some plaintiffs testified or suggested that they did not appreciate the difference between "separate" and "segregated" when they opened their accounts. They readily admit, however, that they now understand that there is a big difference between these two terms. As discussed above, "segregated" means subject to various requirements of the CEA and the CFTC regulations that provide that the funds are owned by the customer and the FCM cannot use them for its own purposes. These funds are given high priority in a bankruptcy of the FCM. Holding funds in a "separate" account, on the other hand, has no legal significance and provides no protection to the customer. It means merely that the FCM would keep the money in a separate account with funds of other customers engaging in that particular type of trading. It does not mean that the customer owns the funds, and nothing in the Agreement or commodities laws prohibits the FCM from transferring those funds to other accounts or using them for any other purpose.

10.    Peregrine as Counterparty or Pass-Through Broker

The plaintiffs also attempted to support their claim that they owned the funds in their accounts with their testimony that Peregrine was a pass-through broker, not the counterparty in any forex transaction. Some of the plaintiffs testified that they chose Peregrine because they

37

believed it was a pass-through broker.  They said that this meant that Peregrine would not be the counterparty from whom the customer was buying any given sovereign currency.   Instead, they testified that Peregrine had access to the interbank market that retail customers could not trade on directly.  Peregrine would simply place trades for customers on that interbank market, collecting only a commission.   This, according to the plaintiffs, would eliminate the inherent conflict of interest that many other forex dealers have when they are the counterparty to their customers and seek to profit in any transaction at the expense of their customers.  The plaintiffs also argue that it supports their contention that they own the funds in their accounts at Peregrine.  Olson and Shofner gave brief testimony on this issue.  Both testified in effect that their margin funds had to be in the account at Chase or it would not engage in transaction with or for (it's not clear which) Peregrine on behalf of its customers.

This testimony, however, does not support the plaintiffs' contention that they owned the funds in Peregrine's forex account at Chase.   First, there was no testimony from a person with knowledge of the terms of the relationship between Peregrine and Chase or any other participant in the inter-bank forex market.   Thus, there was no credible evidence that established that Chase or any other bank required any particular amount of collateral to be deposited with it before it would enter into forex or OTC metals transactions for Peregrine customers.

Second, even if the plaintiffs are correct that Chase required a certain percentage of margin to be deposited with it based on the total outstanding obligations of Peregrine's forex customers, this proves nothing about the ownership of those funds.   Chase would presumably be satisfied whether those funds were owned by Peregrine or the customer as long as it had the right to take the funds in the event of trading losses, which the plaintiffs' argument assumes Chase

38

would have.  So even if Chase required a certain percentage of margin funds to engage in any

particular aggregate amount of transactions, this would not establish or even imply that

customers owned the funds in the Peregrine forex account at Chase.

Third, to the extent Olson or Shofner suggested that Chase would require that any

particular customer have sufficient margin on deposit with it before it would execute trades for

that customer, this is not correct.  As Olson admitted, the forex account at Chase was aggregated,

so Chase had no way of knowing which customers were associated with which funds in the

account.   Chase would only be aware of the aggregate of all funds held in the forex account and

all outstanding liabilities based on transactions it undertook with or for Peregrine.

Thus, even if plaintiffs are correct that Peregrine acted only as a pass-through broker

regarding forex and not as the counterparty, this does not provide any basis for concluding that

the plaintiffs owned the funds in their forex accounts at Peregrine.

It should be noted that the trustee appears to deny that Peregrine was a pass-through

broker, pointing instead to a specific provision in the Agreement that states the opposite - that

Peregrine acted as the counterparty to the customer.  Paragraph 7(a) states as follows regarding

forex trading:

> (a) Capacity.  PFGBEST shall act as a principal and is the counterparty in each Currency
> Forex contract or transaction with Customer.   Customer acknowledges, understands and
> agrees that PFGBEST is not acting as a broker, intermediary, agent, advisor or in any
> fiduciary capacity to Customer in Currency Forex transactions.

Ex. 8, Par 7(a).  This provision identifies Peregrine as the counterparty to the customer in all

forex transactions.   Earlier in Paragraph 7, however, it states:

> The interbank system consists of counterparties that exchange currency positions with
> each other.   A counterparty may be, but need not be, a bank.

Ex. 8, Par 7.   This sentence suggests that parties other than Peregrine could be the counterparty.[6]

The court need not resolve this issue, however, because even if plaintiffs are correct that

Peregrine operated as a pass-through broker, it does not help them meet their burden of proof.


    11.    <u>Foremost Not Agent of Peregrine</u>

    Although the complaint contains allegations about representations made by Foremost

brokers, plaintiffs presented virtually no evidence that the brokers' statements were at odds with

the conclusion that Peregrine owned the funds attributed to customers' forex accounts.  The

plaintiffs failed to establish that Foremost was Peregrine's agent, so Foremost brokers'

statements are not binding on Peregrine.  Even if there was an agency relationship, however, the

statements do not help plaintiffs establish that they owned the money in their accounts.

    First, plaintiffs failed to present any proof that established that Foremost was the agent of

Peregrine.  Under Illinois law, "'[a]n agent's authority may be either actual or apparent, and

actual authority may be express or implied.  And only the words or conduct of the alleged

principal, not the alleged agent, establish the actual or apparent authority of an agent.'" *Opp v.*

*Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000), quoting *C.A.M. Affiliates, Inc. v.*

*First American Title Ins. Co.*, 306 Ill. App. 3d 1015 (1999).   Actual authority requires an explicit

grant of authority by the principal to the agent to perform a particular act.  *Id.*  Foremost's status

as a GIB of Peregrine is insufficient as a matter of law to create an agency relationship.

*Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 783 (7th Cir. 1999).  Plaintiffs admit that

the agreement between Peregrine and Foremost expressly provides that Foremost is not the agent

---

    [6]This is yet another example of the bad drafting of the Agreement.

of Peregrine.  Ex. 16, Par. 16.  Thus, there is no basis in the evidence for concluding that

Foremost had actual authority to act as agent for Peregrine.

Plaintiffs also failed to present any evidence to establish apparent authority.  "'Apparent

authority arises when a principal creates, by its words or conduct, the reasonable impression in a

third party that the agent has the authority to perform a certain act on its behalf.'" *Opp*, 231 F.3d

at 1065, quoting *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 218 Ill. App. 3d 383  (1991).

"The test of agency is whether the alleged principal has the right to control the manner and

method in which work is carried out by the alleged agent and whether the alleged agent can affect

the legal relationships of the principal.  The burden of proving the existence of an agency

relationship and the scope of authority is on the party seeking to charge the alleged principal."

*Oliveira-Brooks v. Re/Max Int'l, Inc.*, 372 Ill. App. 3d 127, 134 (1st Dist. 2007), citing *Anderson

v. Boy Scouts of America, Inc.*, 226 Ill. App. 3d 440, 443–44 (1992); *Lang v. Silva*, 306 Ill. App.

3d 960, 972 (1st Dist. 1999).

Plaintiffs presented no testimony at trial of anyone from Foremost, and presented only the

deposition testimony of one former employee of Peregrine, Cuypers.   Nothing in her testimony

supports an assertion of apparent authority.  There is no evidence that Peregrine had the right to

control the manner and method in which work was carried out by Foremost, or that Foremost

could alter the legal or contractual relationship between Peregrine and the plaintiffs.  There is no

evidence that Peregrine created, by its words or conduct, the reasonable impression in the

plaintiffs that Foremost had the authority to make representations about the plaintiffs' accounts

on its behalf.   The only evidence pointed to by plaintiffs to establish an agency relationship is the

testimony of some plaintiffs that they believed Foremost served as GIB only for Peregrine, not

for other FCMs or forex dealers.   This is woefully inadequate to support a finding of an agency

relationship.  Plaintiffs failed to prove that Foremost was the agent of Peregrine.

Second, even if Foremost was the agent of Peregrine, the only evidence that Foremost

made any representations that could help the plaintiffs' case was the testimony by Shofner that

Bob Bunn at Foremost told him that he could ignore the Forex Risk Disclosure as "generic."

Even if Bunn made such a statement and it was attributed to Peregrine, it is far too vague to have

any real meaning.  It did not state or even imply that a customer would own funds transferred to

Peregrine for forex trading, or that the law and resulting risks were not exactly as described in the

disclosure.   This statement adds little to the plaintiffs' case.


12.    "Consideration" Argument

As noted above, plaintiffs argued that this case involves a purchase money resulting trust,

in which one party purchases an asset with his own funds but puts title to the asset in the name of

another.   In these types of cases, Illinois courts often focus on the intention of the party giving

the consideration for the purchase, and a rebuttable presumption of a resulting trust arises in

favor of that party.  Plaintiffs made this argument at oral argument on the trustee's motion.  They

raised it again in a recently filed motion seeking entry of judgment in their favor under Rule

52(c) at the close of their case in chief, before the trustee has put on evidence.  This frivolous

motion is a transparent attempt to argue again that the presumption of a purchase money resulting

trusts arises in this case because the funds plaintiffs transferred to Peregrine constituted

consideration.   This argument has no merit for three reasons.

First, as noted above, in a brief on this issue submitted during oral argument, the plaintiffs could not articulate how this case involves purchase money.  In their recent motion, the plaintiffs now state that the money they transferred to Peregrine was "consideration" for the creation of their accounts at Peregrine.  This is not correct.  The accounts were opened before the funds were transferred.  Under the Agreement, the customer was required to provide margin for trading before he could begin trading with or through Peregrine.  Thus, the margin funds were not "consideration for opening the account;" they were a contractual precondition to placing trades under it.  The money transferred to Peregrine was not purchase money for any asset now held in Peregrine's name.

Second, if plaintiffs are suggesting with this new argument that the money they transferred to Peregrine was used as "consideration" for whatever currencies or metals were purchased on their behalf, the evidence does not support this theory.  They failed to put on any credible evidence of the mechanics of how forex trading worked at Peregrine.   They presented no evidence about the process by which trades were requested by customers, what Peregrine did with those requests, how open positions were held by Peregrine, Peregrine's relationship with Chase or any other member of the interbank system, which party (Peregrine,  Chase, or any other member of the interbank system) provided the credit for the forex and OTC metals transactions in which customers traded on a 50:1 margin (meaning that for every dollar held as margin, the customer could borrow $50), or in what circumstances Peregrine took margin from their accounts to cover trading losses.  In fact, the testimony of the plaintiffs contradicts this theory.  They testified that they believed Peregrine could use the funds in their accounts only to pay commissions and to cover trading losses.   They never testified that Peregrine used the money in

their accounts to actually purchase currencies or metals on their behalf.  Thus, plaintiffs have
failed to prove facts that could even potentially give rise to a presumption of a purchase money
resulting trust.

Finally, even if the plaintiffs are correct that a presumption of a resulting trust arises in
this case, the court would still grant the trustee's motion.   The evidence presented during the
plaintiffs' case in chief rebutted any such presumption, for all the reasons discussed above.   And
even under the plaintiffs' view of Illinois law, once the presumption is rebutted, they must prove
the resulting trust by clear and convincing evidence.  *See, e.g., Zack Company v. Sims*, 108 Ill.
App. 3d 16, 26-27 (1st Dist. 1982). The plaintiffs have failed to meet that standard, so the trustee
is entitled to judgment in any event.


13.   <u>Conclusions</u>

The plaintiffs chose to put on a bare-bones case.  The direct testimony of each plaintiff
was very brief and established only a few points without elaboration, primarily that the plaintiffs
did not intend to transfer title to Peregrine.   Only on redirect examination did plaintiffs begin to
flesh out their testimony.   Plaintiffs chose not to call Foremost brokers as witnesses or to put on
any witnesses besides the plaintiffs and Ms. Cuypers via deposition.   The evidence presented
was wholly inadequate to meet their burden of establishing by clear and convincing evidence
that, despite their transfer of funds to accounts owned by Peregrine, the plaintiffs retained
ownership of those funds and any gains from trading.

Instead, the terms of the Agreement and all the circumstances surrounding the transfers
show that they did not retain ownership of the funds.   As discussed above, the Agreement is

most reasonably interpreted to reflect applicable law regarding ownership of funds, under which

customers who were protected by segregation requirements owned the funds in their accounts,

while customers who were not protected by these requirements (like the plaintiffs) did not own

the funds in their accounts.   The Forex Risk Disclosure and express warnings received by each

customer in the new account email made this clear, and are completely inconsistent with the

plaintiffs' theory of ownership.   Each plaintiff understood the warnings he received.   Each knew

that the money he sent to Peregrine was not protected in any way under the law, and each knew

there was no contractual provision giving him ownership of the funds after transfer.  Each knew

exactly the risk he was taking and decided to go forward anyway.

The plaintiffs' testimony about their intent to retain title when they transferred the money

was not persuasive.  Each simply made the bare, unsupported assertion that they intended not to

transfer title when they wired margin funds to Peregrine after they opened their accounts.  There

was no credible evidence to corroborate this testimony through statements or actions of the

plaintiffs before or at the time of the transfers.  Instead, the court finds that the plaintiffs'

testimony regarding their intent to retain title to the money reflects an after-the-fact attempt to

support a basis for receiving priority over unsecured creditors in bankruptcy.   Plaintiffs have

failed to prove their own intent to keep ownership at the time of the transfers.

Under Illinois law,  if the evidence can be interpreted in any reasonable fashion other than

a resulting trust, the trust theory fails.  Here, the most reasonable interpretation of the evidence is

that the money held in the plaintiffs' accounts was owned by Peregrine, not the customers.   The

evidence therefore supports a reasonable explanation other than a resulting trust - that Peregrine

owned the funds in the plaintiffs' accounts - that defeats their claim of a trust.  The plaintiffs

45

have failed to meet their burden of presenting clear and convincing evidence of a resulting trust

by a wide margin.  The trustee is entitled to judgment in his favor.

The court will therefore grant the trustee's motion, and enter judgment in his favor on

Counts I and II of the complaint.


Dated:   May 27, 2014

ENTERED:

Carol A. Doyle
United States Bankruptcy Judge